THE ELECTRIC PLASTER COMPANY v. MARY E. REEDY,
*as Administratrix, etc.*

No. 14,601. (85 Pac. 824.)

SYLLABUS BY THE COURT.

1. MASTER AND SERVANT—*Death by Wrongful Act—Risk Not Assumed.* In an underground gypsum mine not operated under the mining laws of the state the superintendent, whose duty it was to direct the operations of the miners and to locate where shots should be placed, ordered the deceased and others immediately before a shot was fired to go for safety into a room directly opposite a thin wall where the shot was located, under the belief that the wall or pillar was much thicker than it actually was, and that the force of the shot would therefore break into another part of the mine instead of breaking through where it did, resulting in the death of the deceased. *Held,* that it was the duty of the superintendent to know the actual thickness of the pillar and the probable consequences resulting from the shot being so placed, and that the risk was not one which deceased had assumed.

2. ———— *Contributory Negligence—Question of Fact.* In such a case the question of the contributory negligence of deceased is one of fact which, having been fairly presented in the instructions, is determined by a general verdict in favor of plaintiff in an action against the mining company for wrongful death.

Error from Marshall district court; SAM KIMBLE, judge. Opinion filed June 9, 1906. Affirmed.

## STATEMENT.

IN an action for the benefit of herself and minor child defendant in error recovered a judgment of $5000 for the death of her husband, William R. Reedy, who was injured March 24, 1904, by the explosion of a blast in plaintiff in error's mine. His death occurred two days after the accident. The plaster company brings error.

Plaintiff in error is engaged in mining gypsum at Blue Rapids, and in the manufacture of gypsum plaster. The mine is what is known as a drift, or tunnel, mine. A long corridor, or main tunnel, runs in a northerly direction from the main shaft at the south, and there are a number of air-shafts. The gypsum is mined from rooms off from the main tunnel. The entrances into these rooms are made at intervals, generally leaving, as supports to the roof, pillars twenty-five or thirty feet in thickness between the main tunnel and the rooms. The method of making the rooms is to drift in from the side of the main tunnel a distance of twenty-five or thirty feet and then to extend the opening in a direction parallel to the main tunnel, when another opening is made into the main tunnel, leaving the partition or pillar.

Some of the miners work by the ton, in rooms assigned to them individually, and each of these rooms is known by the name of the miner who works in it at the time. Others work by the day in the main tunnel or in rooms known as "company" rooms; generally two miners, together with an expert miner, who directs or "spots" the shots, or blasts, after the holes are bored.

The gypsum mines are not operated under the mining laws of the state, but the rules of the company require that warning be given of all shots in time for the men to seek a place of safety, and this regardless of whether they are working in separate rooms or in the main entry, or tunnel, or in "company" rooms.

The deceased, William R. Reedy, at the time of the

accident was employed by the day at the mine, and was at work on the afternoon of that day in the "Marcy" room, laying track. Previously he had been at work in what was known as the "Blossom" room. He had laid track in the "Blossom" room in the forenoon. He was an expert miner, and his duties had included the locating, or "spotting," of shots and the firing of them. The superintendent of the plaster company was Al. Shinn, who was in charge of the mine. Among other things it was his duty to direct the men in their work, to locate where the shots were to be placed, and to give orders as to what direction the rooms and openings should take. He also directed the men where to go for safety when shots were to be fired.

On the east side of the main tunnel the "Blossom" room was being projected, at first in a northeasterly direction, parallel with the main tunnel and distant therefrom about twenty-five feet. As the work in this room progressed its direction was changed gradually toward the west or northwest. It was claimed by plaintiff below that the superintendent was not aware of the actual direction it was being pushed, and that he supposed and led the workmen under him to believe that it was being extended parallel with the main tunnel, and that it would break into the "Marcy" room, which was then being opened at a point north of it. As a matter of fact it had been extended so far in a northwesterly direction that it approached very near to the main tunnel.

The shot which caused the accident was placed in the "Blossom" room where the pillar was only four and one-half feet from the east side of the tunnel and in a hole drilled probably three or four feet nearer the wall of the tunnel, at a point directly opposite the entrance into the "company" room. The "Marcy" room, which had been started on the east side of the main tunnel north of the "Blossom" room, was at this time fully thirty-five or forty feet distant, and had been opened only about twenty feet east of the main tunnel. On

the day of the accident Lawrence Marcy was at work there. When the shot was ready to be fired Shinn, the superintendent, ordered him out of the "Marcy" room into the "company" room, and also ordered all the other men at work in that part of the mine into the "company" room for safety, and went there himself. Blossom, who gave the signal and then fired the shot, had been ordered to go to the same place, and ran out, intending to go there, but stumbled and fell in the main tunnel and escaped injury. Reedy, the deceased, and another miner, who were laying track in the "Marcy" room, in obedience to the orders of Shinn had gone to the "company" room as soon as Blossom signaled, and Reedy was standing about eighteen feet inside the entrance, near Marcy. The "company" room opened off on the west side of the main tunnel and was probably thirty-five feet across at its widest place, and pear-shaped, the narrow portion being the entrance. The explosion broke through the narrow space into the main tunnel and threw a mass of rock and stones directly into the "company" room, some of which, striking Reedy, caused the injuries that resulted in his death.

Upon the trial the company claimed and sought to prove by the superintendent that he knew the direction the "Blossom" room was being pushed; that it was the intention originally to have it meet the "Marcy" room, but that the plans had been changed; and that for the purpose of giving proper circulation to the mine it was concluded to have it break into the main tunnel where the shot actually opened it. It was claimed that the men knew of this change in the plans; that Reedy, being an expert miner, who until the day of the accident had worked in the "Blossom" room, knew the direction it was going; that he was in the "Blossom" room a few moments before the shot was fired and after it had been placed, and knew or should have known fully the probable effect it would have; and that he was guilty of contributory negligence in failing to take a position of

Plaster Co. v. Reedy.

safety near the sides of the "company" room, where it seems some of the miners stood and were not injured.

There was some dispute as to the shape of the "company" room, plaintiff in error claiming that the main body of it was circular, leaving shoulders where it widened out from the entrance, and that behind these shoulders the deceased could have stood in safety. The contention on the other hand was that the entrance to this room was so wide in comparison to the width of the room itself as to leave no abrupt shoulders; that the shot which caused the accident was placed at a point directly across the main tunnel from the entrance to the "company" room; that neither the miners nor the superintendent supposed that the shot would break through where it did; and that the deceased was therefore guilty of no contributory negligence. When the shot was fired the shower of rocks fell all over the "company" room, and some of the others who stood near Reedy were knocked down by the explosion.

Two maps were offered in evidence; one, drawn by the officers of the plaster company several weeks after the accident, which sustained to some extent the contentions of the company as to the shape of this room and of the "Blossom" room, and another, made immediately after the accident by the miners, who identified it as correct, which sustained the claims of plaintiff below as to the shape and direction of the rooms.

Plaintiff below charged defendant company with negligence in permitting the "Blossom" room to be curved to the northwest so as to leave the pillar or rib between it and the main tunnel so thin that a shot would break through into the main tunnel where it did, and in ordering the miners into the "company" room directly in front of the place where the shot broke through.

*H. A. Russell,* for plaintiff in error.

*W. W. Redmond,* and *James G. Strong,* for defendant in error.

The opinion of the court was delivered by

PORTER, J.: The contentions of plaintiff in error that the court should have rendered judgment upon the opening statement of counsel for defendant in error, and that the objection to the introduction of any testimony under the petition should have been sustained, will be considered together with the claim that the court erred in overruling the demurrer to the evidence. These three contentions all revolve about the proposition that the deceased was guilty of contributory negligence which prevented defendant in error from recovering.

It is urged that, being an experienced miner, and familiar with the surroundings and situation, the deceased knew or should have known the thinness of the wall in the "Blossom" room, the location of the shot and its probable consequences, and, being charged with this knowledge, he should have sought a place of safety near one of the sides of the "company" room and away from the front of the entrance. The testimony of the experienced miners was to the effect that in an underground mine like this, where impenetrable darkness prevailed everywhere, except as dispelled for a short distance by the smoky lamps carried in the miners' caps, it was impossible for any one, without the use of a compass and frequent measurements, to know with any certainty the direction a tunnel or room was being worked. None of them ever used a compass, because, as appears from the evidence, it was the duty of the superintendent, Shinn, to give the orders to the others, including deceased, as to where and in what manner the work should be done. It was his duty, as a matter of law, to ascertain and know the thickness of the pillars, and to take reasonable precautions for the safety of the men. It was the duty of the superintendent to know the direction the "Blossom" room had been extended and the danger which would probably result

to the men in the "company" room when the shot was fired.    He represented the company.    (*A.  T.  &  S.  F. Rld. Co. v. Moore,* 29 Kan. 632; *Mining Co. v. Robinson,* 67 Kan. 510, 73 Pac. 102; *Brick Co. v. Shanks,* 69 Kan. 306, 76 Pac. 856.)

The testimony of several of the miners was that the superintendent had told them that the "Blossom" room was being extended so as to break into the "Marcy" room on the north, and, indeed, every circumstance in the case warranted the jury in finding that this was true, and that no one was more astonished than Shinn himself when the shot broke through where it did.    John Marcy, one of the miners, testified that the superintendent remarked when the accident occurred, and Reedy was found to be injured:

" 'The company will just raise hell with me.  .  .  . I ought to knew the strength of that pillow.'

"Ques.  What did you understand Mr. Shinn to mean by that pillow?   Ans.  Why, that pillow where the shot came through; said he ought to knew the strength of it."

It is incredible that the superintendent would have ordered the men to go into the "company" room directly across the main tunnel from where the shot was placed and expose them and himself to a danger so apparent if he had supposed the rib between the "Blossom" room and the main tunnel was so thin.   He evidently thought the "Marcy" room was the point of danger, for he warned Marcy out of that and ordered him to a place of great danger.    Marcy, when the explosion came, was standing beside Reedy, and was knocked down by the force of the explosion.    The room he had just been ordered out of was, in fact, a place of safety.   The evidence on the part of plaintiff was sufficient to support all the material allegations of the petition, and it is unnecessary to discuss the claim that the petition stated no cause of action.

We find no ground for the contention that there was error in the instructions.    The court instructed the

jury quite fully upon the question of the contributory negligence of the deceased, and the complaint that instructions Nos. 1 and 3, requested by plaintiff in error upon that question, were refused has no force. The same may be said of requested instruction No. 2, which referred to the knowledge of deceased of the thinness of the wall. The sixth instruction given by the court stated the law more favorably to plaintiff in error. Requested instruction No. 4 was properly refused. A portion of it reads as follows:

"That at the best the employment is a dangerous one, and the safety of the employment depends, possibly, more largely upon their own care and caution than the perfect condition of the mine."

There was no contention that the company was required to keep its mine in perfect condition; in fact, the condition of the mine was not involved. The questions whether plaintiff in error was negligent in the operation of the mine, and whether that negligence was the proximate cause of the death of Reedy, were involved; and, even if the condition of the mine had been the principal question in the case, there could have been no occasion for the court to draw a comparison showing the relative importance of those things which make for the safety of one employed in the dangerous business of mining. The general rules of negligence which apply to master and servant employed in any hazardous business apply to this case.

The theory of defendant in error is that the place where deceased stood in the "company" room would have been a place of absolute safety if the shot in the "Blossom" room had broken toward the "Marcy" room. That the force of the explosion would have been in that direction if the "Blossom" room was being pushed in the direction every one had been led to believe it was, is clearly established by the evidence. The question of contributory negligence was one of fact, and this defense was fairly presented. The jury had before them abundant evidence to warrant the finding, which is in-

volved in their general verdict, to the effect that deceased was not guilty of contributory negligence.

By their verdict they also found that the company failed to discharge a positive duty which it owed the deceased to provide him a safe place in which to work, and that this negligence of the company was the proximate cause of his death. The doctrine of assumed risk therefore has no application to the facts in the case. (*Emporia v. Kowalski*, 66 Kan. 64, 70, 71 Pac. 232; *Schwarzschild v. Drysdale*, 69 Kan. 119, 122, 76 Pac. 441.)

The judgment is affirmed.

All the Justices concurring.