NETTIE HANSON, *Appellee,* v. THE CHICAGO, ROCK
ISLAND & PACIFIC RAILWAY COMPANY, *Appellant.*

No. 16,744.

SYLLABUS BY THE COURT.

RAILROADS—*Injury to Passenger Alighting in the Dark from
Train Leaving His Station.* In an action for damages for the
death of a passenger evidence was adduced to show that it was
the custom on the defendant's night trains to turn down the
lights and furnish pillows for passengers who would pay for
their use; that a passenger who was asleep on such a train
when it reached the place of his destination, at one o'clock in
the morning, was awakened immediately after it left the sta-
tion; that, assisted by the porter, he went forward in an ap-
parently drowsy condition and stepped off the train and was.
killed; that the conductor was near by and observed the pas-
senger's departure; and that the train was not stopped nor its
speed slackened, nor the passenger restrained, although the
danger was apparent to the trainmen. It is *held,* that a de-
murrer to the evidence was properly overruled, and that there
was no error in refusing a request for an instruction to find
for the defendant.

Appeal from Marion district court. Opinion filed
December 10, 1910. Affirmed.

*M. A. Low,* and *Paul E. Walker,* for the appellant.

*W. H. Carpenter,* and *D. W. Wheeler,* for the ap-
pellee.

The opinion of the court was delivered by

BENSON, J.: This appeal is from a judgment award-
ing damages for alleged negligence of the defendant in
permitting, advising and directing a drowsy passenger
to alight from a rapidly moving train in the nighttime,
at a place where there was no platform or light,
whereby the passenger was killed.

The deceased, who was thirty-six years of age, took
passage at Bison, Okla., about 5 o'clock P. M., holding
a ticket to Lost Springs, Kan., where the train arrived
at about one o'clock A. M. It was the custom on the de-

.fendant's trains over this route to turn down the lights in passenger coaches about 10 o'clock P. M., and passengers who paid the charge therefor were furnished pillows by the train porter, and this was done on the night of the accident. Tickets were taken up by a train auditor and checks given to the passengers, and it was the custom of the porter on these night trains to awaken passengers who were sleeping on approaching their destination, and take up their checks. Announcement of the station was given and the train made the usual stop at Lost Springs, where one passenger left the train, and two others entered it. After the train left the station, and while it was moving with rapid and increasing speed, the deceased was observed, with the porter having hold of his shoulder, walking toward the platform. He appeared drowsy, and fell on or brushed against another passenger as he went by. The porter removed the check from his hat and went with him to the platform, where they disappeared down the steps together, and then the porter returned into the car alone. The body was found about 250 yards from the depot. The deceased had been over this route on the defendant's trains running on the same schedule on four previous occasions.

In answer to special questions the jury found that the custom of taking up checks and awakening sleepy passengers on night trains had existed for a long time prior to the injury; that the deceased was acquainted with this custom; that he was sleeping when the train reached Lost Springs; that he was taken out of his seat by the employees of the defendant and taken to the platform for the purpose of getting him to leave the train while it was in motion, if they could get him off before it gained too much speed; that they knew he was in a sleepy, drowsy condition; that the night was dark; that the deceased was unfamiliar with the place; that the train was running rapidly; that there was no conversation between the porter and the de-

ceased with respect to his waiting until the train stopped; and that he did not leave the train voluntarily.

The porter testified that the vestibule was not closed after leaving the station until after the deceased left the car. Before reaching Lost Springs he had been informed that this passenger was destined for that place. There is some conflict in the testimony concerning the occurrences just before the deceased left the train. The porter testified that when he announced the station the deceased was talking with another gentleman in the seat; that, returning into the car after the train started, and when it had proceeded fifty to one hundred feet, he saw the deceased coming out toward the vestibule, and understood him to say that the conductor told him to get off; and that the conductor said "stop," and pulled the bell rope. He also testified:

"Ques. Why did n't he stop? You knew that train was going at a rapid rate? Ans. Yes, sir; I presume it was.

"Q. Did n't you know that it was impossible for a man to get off or on that train when going at a rapid rate? A. I did n't know what he could do.

"Q. You thought that there was a great possibility that he would be injured? A. No, sir; I never gave it a thought.

"Q. Although the train was running rapidly? A. I did n't.

"Q. Notwithstanding the fact that he got off in the dark there that night, the train running rapidly, you never undertook to stop that train after the man got off, or to pull that cord once? A. I don't remember whether or not I did.

"Q. You know, as a matter of fact, you did n't, don't you? A. I don't think the train did stop any more. . . . Well, it did n't stop."

The conductor testified:

"I started into a high-backed coach, the first car back of the smoker. . . . This gentleman came down toward me. I asked him if he wanted to get off there.

He said yes, he did. I said, 'Well, wait a minute, and I'll stop the train'; with that I reached up and pulled the cord, and at that he passed me, and I did not see him any more. This air did n't sound very loud, and when I got out into the vestibule the porter was standing there. I said, 'Did he get off?' He said, 'Yes.' That ended it with me. I turned and went back; that was all that I knew about it.

"Q. Did you see him get off? A. No, sir.

"Q. Did you have any other conversation with him except that you have already detailed? A. No, sir."

On cross-examination he said:

"Q. You did n't stop that train? That train was going rapidly, was it not? A. It was gaining speed right along.

"Q. It was going fast when this man was there at the door, was it not? A. Yes, sir.

"Q. You knew that it was dangerous to get off, did n't you? A. I would not have got off.

"Q. You know as a trainman that it was dangerous for that man to get off? A. Yes, sir; he passed me in the alleyway.

"Q. That is where you pulled the cord? A. Yes, sir.

"Q. When the porter told you a man got off there in the dark, and the train was running rapidly, why did n't you stop the train when the porter told you? A. He told me the man was gone.

"Q. Both of you knew that it was dangerous to get off and although the train was running fast and it was dark there, you just went on and paid no further attention to it; that is the way you done it, was it? A. Yes, sir."

A passenger in another coach opening upon the same platform testified that he saw a man who seemed to be sleepy go to the platform, followed by the porter, and heard one of the employees say, "Let him get off if he will"; that the train was going rapidly at the time; and that the trainmen did not pull the bell cord and made no effort to stop it. Another witness testified that as the train started out of Lost Springs he saw some one shake another man and take him out of the coach just back of

the smoker.   This was the coach in which the deceased was riding.

The only errors specified are the decision overruling a demurrer to the evidence, and the refusal to instruct the jury to find for the defendant; and the question now to be decided is whether the evidence is sufficient to sustain the verdict.

It is contended that it is not the duty of a carrier to awaken a sleeping passenger in a day coach on arrival at his destination, if due announcement of the station is made and a reasonable opportunity is given for him to alight.   This is the general rule, although it is said that exceptional circumstances might impose the duty. (2 Hutch. Car., 3d ed., § 1128.)   It is also insisted that the custom shown by the evidence of turning down the lights and furnishing pillows on night trains, that passengers may sleep more comfortably, does not impose the duty.   The defendant also contends that the proper announcement of the station having been made, and sufficient opportunity given for the egress of passengers, the deceased, by remaining in the coach until the train started, became a trespasser, to whom it owed no duty except to refrain from willfully or wantonly injuring him.

The district court did not instruct the jury that the custom, if proved, imposed the duty on the trainmen to awaken a sleeping passenger on arrival at his destination, but did instruct in substance that if they found the custom existed as alleged, and that it was known to the decedent, and that he was asleep on arrival at his destination, to the knowledge of the trainmen, and they failed to awaken him in proper time to leave the train, and that immediately after leaving the station they discovered that he had not left the train because of being asleep, he should be considered as a passenger; and if the trainmen were negligent in commanding or directing him to leave the train, which negligence caused his death, then the plaintiff might recover; but if the de-

ceased voluntarily left the train, without being ordered or directed to do so, or if he was advised to wait and was told that the train would be stopped so that he might leave it, and notwithstanding this advice he left the train without waiting for it to stop, there could be no recovery.

Cases are cited in support of the proposition that when a passenger fails to leave a train when his destination is reached, after a reasonable opportunity to do so, the relation of passenger and carrier is terminated and he then becomes a trespasser. This is not true, however, in all cases. If one in such a situation offers to pay fare to a station beyond, the relation continues unbroken. (*Forbes v. Railway Co.*, 135 Iowa, 679.) It would be a harsh rule that would hold every person a trespasser who remains upon a train after it reaches the place designated in his ticket. Whether he is a trespasser must depend on the circumstances of each case, which may present questions for a jury. It is held that a person who goes aboard the wrong train, or one upon which his ticket does not entitle him to ride, is nevertheless a passenger; and while he may be ejected, it must be done with all proper care. In such a case it was held that although the passenger has no right to a passage, he can not be expelled from the train as a trespasser, but must be treated as a passenger who by mistake has got upon a train on which, by his contract, he is not entitled to ride. (*Lake Shore & Mich. Southern R'y Co. v. Rosenzweig*, 113 Pa. St. 519; *Arnold v. Pennsylvania Railroad Co.*, 115 Pa. St. 135.) In a case in Michigan where a sleeping passenger delayed leaving the train after a full opportunity to do so had been given, and was afterward injured by the alleged negligent act of the conductor, it was held that the claim of the company that the relation of passenger and carrier had ceased and that the company owed him no duty of protection could not be sustained as matter of law, but was properly left to the jury. (*Bass v. Cleveland, etc.,*

*R. Co.*, 142 Mich. 177.) In a note following a report of that case in volume 7 of the American and English Annotated Cases it is said that the rule that no obligation to arouse a sleeping passenger and to see that he gets off at his destination "has been laid down in cases where passengers have sought to recover damages for being carried beyond their destinations, and is not in conflict with the holding of the reported case." (p. 721.)

It was held in *Railway Co. v. Wimmer*, 72 Kan. 566, that "the duty which a railway company owes to a passenger to exercise the highest degree of care for his safety which is reasonably practicable does not cease until the passenger has reached his destination and left the train." (Syllabus.) It is probably true that if a passenger should unreasonably delay his departure from a train in such circumstances as to indicate a willful or wanton disregard for the rights of the carrier or the traveling public, thereby intending to compel a stop for his benefit, or because of ill will or to secure further passage without pay, or like wrongful purpose, he would thereby forfeit his right to the high degree of care due to a passenger, and might, if the circumstances warranted the inference, be considered a trespasser; but the question in case of any doubt or uncertainty of the facts would be for a jury. Here it is not claimed, and the circumstances do not indicate, that the delay of the deceased was caused otherwise than by his being asleep or bewildered because of sleepiness. In this situation the court could not arbitrarily declare that he had forfeited the ordinary rights of a passenger, and did not err in submitting that matter to the jury.

The case of *C. K. & W. Rld. Co. v. Frazer*, 55 Kan. 582, cited by the defendant, is not in conflict with these views. It appeared there that passage had been taken upon a construction train on an unfinished road. At the end of the road, after nearly half an hour had elapsed and all others had left the caboose, a passenger who without any apparent cause remained upon it was killed.

in switching, his presence being unknown to the train-men. It was held that instructions to the effect that he was entitled at the time of the injury to the extra-ordinary care due to a passenger were erroneous. The language of the opinion was correct as applied to the facts of that case, but is not an authority for the contention that it should be held as a matter of law that the decedent in this case had forfeited his right to such care before he was killed.

The facts concerning the custom to turn down the lights, furnish pillows for the comfort of those desiring to sleep, and to awaken sleeping passengers and take up their checks, were circumstances for the jury explanatory of the delay of the passenger, and proper to be considered in deciding whether the relation of passenger and carrier had terminated before he stepped from the train.

It is also contended that the evidence shows such contributory negligence as to defeat a recovery. It is said that the night was dark, the train was running rapidly, the place was unfamiliar, and the departure from the train voluntary. The force of this argument is greatly diminished by the finding of the jury that the deceased did not leave the train voluntarily, and this finding we think is supported by the evidence. He was awakened while upon a moving train, which had just left the station where he desired to stop. The rate of speed could hardly be determined by him on the instant, especially in his drowsy condition. Those upon whom he had a right to rely did not oppose, but one at least actually assisted him down the steps, according to the testimony. It is true the conductor says he told him to stop, and that he pulled the cord, but it is significant that the train did not stop, nor was its speed slackened, and the claim that the conductor pulled the cord is disputed by other testimony. The porter, who was in the vestibule with the passenger, testified that he (the porter) did not pull the cord, and according to testimony which the jury had a

Hanson v. Railway Co.

right to believe, although contradicted, one of the employees said: "Let him get off if he will." It can not be said as a matter of law that a man of ordinary prudence in that situation would not have stepped off the train as he essayed to do. Happily for the traveling public the care, patience and fidelity of trainmen generally are such that passengers are accustomed to rely, and ordinarily may safely rely, upon their judgment, knowledge and skill in such matters; and one should not be held guilty of contributory negligence when he does so, merely because it is determined by a fatal result that his confidence was misplaced. It appears that while the danger was obvious to the porter and the conductor, it was not necessarily so to this passenger. (*St. Louis, I. M. and S. R. R. Co. v. Cantrell*, 37 Ark. 519; *Jones v. Chicago, Milwaukee & St. Paul Ry. Co.*, 42 Minn. 183; *McCaslin v. Railway Co.*, 93 Mich. 553; *Waller v. The Hannibal & St. Joseph R. R. Co.*, 83 Mo. 608; *Haug v. Great Northern Ry. Co.*, 8 N. Dak. 23; *S. K. Rly. Co. v. Pavey*, 48 Kan. 452.)

A passenger who, because of drowsiness or confusion caused by no wrongful act on his part, attempts to jump from a rapidly moving train in the darkness, while apparently unaware of the danger, is, we believe, entitled to the restraining care of those in whose protection he has placed himself, who fully understand the danger, and are in a situation to prevent it. The fact that he slept longer than he ought to have done, if that be a fact, ought not to deprive him of reasonable protection.

The evidence was sufficient to go to the jury, and sustains the verdict. Evidence explanatory of the conduct of the trainmen and to some extent excusing it is not further referred to, the only question here being whether there was competent evidence for the consideration of the jury sufficient to support their findings.

The judgment is affirmed.