MIRIAM CHEEK, *Appellee*, v. THE MISSOURI, KANSAS &
TEXAS RAILWAY COMPANY, *Appellant*.

No. 17,949.

SYLLABUS BY THE COURT.

1. DEATH BY WRONGFUL ACT—*Violation of Mining Act—Action
by Widow*. Section 4992 of the General Statutes of 1909,
giving a right of action against the party in fault to the
widow and lineal heirs of a mine employee who loses his life
because the requirements of the act to protect the health
and safety of coal-mine workers are not observed, takes its
place among the provisions of the civil code relating to death
by wrongful act, and the action may be prosecuted by the
widow when no personal representative of the deceased has
been appointed.

2. COAL MINES—*Generating Fire Damp—Appreciable Quantity
—Examination Every Morning*. Sections 4986 and 5006 of the
General Statutes of 1909, requiring that coal mines generat-
ing fire damp shall be carefully examined every morning
with a safety lamp by a competent fire boss before the
miners and other employees enter their respective working
places, apply to all mines generating such gas in appreciable
quantities, the purpose being to detect the gas as soon as it
appears so that danger from it may be averted.

3. ——— *Purposes of Examination for Gas — Liability for
Results of Neglect*. While the sections just referred to were
designed to prevent injury from gas accumulating in the
working places of a mine while the workmen are away, their
full purpose was to protect mine workers from explosions of
quantities of gas which a careful examination by a competent
person will reveal; and liability attaches for the results of an
explosion of a volume of gas released from an abandoned
mine in dangerous proximity to such working places, when
its presence would have been disclosed by examinations such
as the statute requires.

4. ——— *Neglect of Mine Inspector—No Excuse for Neglect of
Mine Owner*. While it is the duty of the state mine inspector
to see that all the provisions of the act to protect the health
and safety of mine workers are observed and strictly carried
out (Gen. Stat. 1909, § 4993), neglect on his part to require
the appointment of a fire boss in a mine generating fire
damp does not justify or excuse the failure of the mine owner
or operator to do so.

5. ——— *Judicial Notice that Abandoned Mines Generate Gases.* Section 4987 of the General Statutes of 1909, requiring boreholes to be kept not less than twelve feet in advance of the faces of working places of a coal mine when driven toward and in dangerous proximity to an abandoned mine suspected of containing inflammable gases, recognizes that abandoned coal mines in Kansas do generate and may accumulate such gases, and the courts are authorized to take judicial notice of the fact.

6. MINE—*"Suspected" of Containing Inflammable Gases.* The word "suspected" in the section just referred to has its usual and ordinary signification. It does not necessarily involve knowledge or belief or likelihood; and if a person responsible for compliance with the statute entertain even a slight or vague idea of the existence of inflammable gases in an abandoned mine, no matter how it arose, whether on weak evidence or no evidence at all, his duty to take action is imperative under the statute.

7. ——— *Violation of Mining Act—"Willful Failure."* Section 4992 of the General Statutes of 1909, giving a right of action for "any violation" of the mining act or any "willful failure" to comply with its provisions, prescribes a single standard of liability, embracing voluntary acts done in violation of the statute and voluntary inaction when the statute requires something to be done.

8. ——— *Liability—Attaches When Statute is Intentionally Violated—Motive is Immaterial.* In the case of omissions neither bad purpose nor determined obstinacy is essential to create liability, and if one charged with the duty to observe the statute intentionally suffer mining operations to proceed without taking prescribed precautionary measures, he is guilty of a willful failure within the meaning of the law.

9. ——— *Obligation to Drill Boreholes—Not Discharged by Order to Drill.* The obligation imposed by section 4987 is not discharged by ordering boreholes to be drilled not less than twelve feet in advance of the faces of working places. Boreholes must be drilled and kept drilled to the proper depth or a willful failure to comply with the law occurs.

10. ——— *When Requirement of Statute for Boreholes is Satisfied.* The requirement of the section just referred to is satisfied if twelve-foot boreholes are kept drilled in advance of the faces of working places, and it is not necessary that boreholes be drilled a reasonable distance beyond twelve feet, although by so doing danger might be discovered and averted.

11. ASSUMED RISK—*Contributory Negligence—No Defense under Mining Act.* Assumed risk and contributory negligence are not defenses to an action prosecuted under the mining act for loss of life occurring by reason of failure to examine working places for fire damp and failure to keep boreholes drilled in advance when approaching an abandoned mine.

12. —————— *Mining Act Does Not Abrogate Common-law Duties to Employees.* The act providing for the health and safety of persons employed in and about the coal mines of Kansas does not abrogate the common-law duty of coal-mine owners and operators to furnish their employees safe places in which to work.

13. —————— *Joinder of Statutory and Common-law Causes of Action.* Causes of action under the mining act and under the common law may be joined and tried together.

14. EVIDENCE — *Exclusion — Not Prejudicial — Not Reviewable.* Certain evidence offered by the defendant considered, and held, that material prejudice did not result from its exclusion, and that the defendant is not entitled to have the rulings thereon reviewed because the evidence was not presented to the trial court at the hearing of the motion for a new trial. (Civ. Code, § 307.)

15. VERDICT AND FINDINGS—*Sustained by the Evidence.* The evidence examined and found to be sufficient to sustain the general verdict and special findings of the jury.

Appeal from Cherokee district court. Opinion filed April 12, 1913. Affirmed.

*John Madden, W. W. Brown,* both of Parsons, and *Al. F. Williams,* of Columbus, for the appellant.

*C. A. McNeill, A. H. Skidmore,* and *S. L. Walker,* all of Columbus, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff's husband, Thomas Cheek, was killed by an explosion of marsh gas or fire damp ($CH_4$) which occurred on the evening of March 18, 1911, in the defendant's coal mine No. 16, where he was employed as a shot firer. The plaintiff sued for damages for herself as widow and for her two children,

the lineal heirs of Thomas Cheek, and recovered. The defendant appeals.

The workings of mine No. 16 lay in the southeast quarter of a section of land. The northeast quarter of the same section belonged to the defendant and the bulk of the coal underlying it had been taken out through a mine known as No. 7. The shaft of No. 7 was near the northwest corner of the tract, but the mine had been extended into the southeast portion and an entry (mine roadway) known as the 8th East had been driven a short distance into the southeast quarter of the section. No. 7 had been abandoned some three or four years before the occurrence of the casualty in question. The shaft of No. 16 was near the center of the tract in which it was located. The mine, like No. 7, was worked on the room and pillar plan, and had been extended northward and eastward as well as in other directions. Two parallel entries, with an eight-foot pillar of coal between them, known as the Little North straight and the Little North back entries, were being driven in the direction of No. 7 from an entry of No 16, known as the 4th East. Day and night shifts were employed. The work progressed at the rate of about 100 feet per month, and the entry had been extended some 700 or 800 feet from the point of its origin. The purpose was to break through into No. 7 in order to reach some coal adjoining it and to secure certain advantages in the operation of No. 16.

John Jopling was the defendant's general superintendent, having charge of several of its mines. He had been superintendent of No. 7. Francis Ryan was mine foreman, or pit boss, having immediate charge of the inside workings of No. 16. He had been pit boss of No. 7. Mike Lundy and James Cahill were driving the back entry, which was 12 or 14 feet wide. Lundy worked in the day time and Cahill at night. Barney Buchella and Charles Troy were driving the straight entry. Cahill worked on the night of March 16.

He went into the mine at 10 o'clock P. M. and came out at 5:30 the next morning. The 17th was a holiday. On the afternoon of March 18, before discontinuing work, Lundy put two shots in the face of the entry, one on the right side about five and one-half feet deep and the other on the left side about six feet deep, with a four foot cutting between them. Similar shots were placed by the entry man in the face of the straight entry, and others were placed by workmen in various rooms turned off to the right and left from the two entries. At about 4:30 in the afternoon the miners left the mine and three shot firers went in. One of these, W. D. Jeffreys, worked on the south side of the mine, while Jake Burgin and Thomas Cheek fired the shots in the Little North, Burgin working on the back entry and Cheek on the straight. Jeffreys completed his work and returned to the bottom of the shaft. Burgin and Cheek did not return. In due time an alarm was given, and Jopling and Ryan were called by telephone. Jopling arrived first and immediately went into the mine with four volunteers, all of them carrying open lights. One member of Jopling's party was left at the mule stable in the mine. Jopling and the other men went forward, and soon afterward met death by a second explosion of gas. Ryan, with a second rescue party, arrived at the mule stable and learned the direction which the Jopling party had taken. Ryan directed the men with him to take one course forward while he took another. He carried an open light, which a little later ignited gas and caused a third explosion. The flame went away from him and he was not injured. Hearing this explosion, the men who had taken the course which he suggested threw themselves upon the bottom of the entry they were in and buried their faces in the mud, and the explosion passed over them. The flame rolled over them with a sound like thunder. The resulting heat was intense. All the members of the party were stunned, their lights were put out, and they

crawled on hands and knees in darkness back to a place of safety. These events demonstrated that the mine had been filled and was still filling with fire damp. Safety lamps were then used, and by their aid it was discovered that ·the wall between the two mines had been perforated, and that the gas was pouring into No. 16 from No. 7 in great volumes. Through persistent efforts the opening was stopped up with hay and other material, and by utilizing the ventilating apparatus to its full capacity the mine was ultimately cleared of gas. Burgin had fired all the shots in the rooms of the back entry from the 16th, which was next to the face, to the 1st, near which he was found dead. His clothing had been burned from his body. Cheek had fired all the shots in the straight entry from the 16th to the 6th. His body was not found until March 24. It was lying in room 8, a room in which there had been no shot, under tons of rock which had been thrown down from the roof of the room by one of the explosions. His head and hands, which were exposed, were burned. His cap and lamp were found in room 6 where his last shot had been fired, indicating that he had run from there to the room in which there was no shot. Subsequent investigation disclosed that the right-hand shot placed by Lundy in the face of the back entry had broken through the pillar of coal between the two mines, which was only nine or ten feet in thickness. The opening was about 2 feet in height and about fourteen inches in width on the side of No. 16. It narrowed to a width of about eight inches on the side of No. 7. Fire damp had been stored up in No. 7 in such quantities and under such pressure that with only this small aperture for a vent it filled and refilled No. 16 and produced the catastrophe which has been described.

The petition charged that the defendant failed in its common-law duty to furnish Thomas Cheek a safe place in which to work, and failed to comply in a num-

ber of particulars with statutory requirements designed to promote the safety of persons employed in the mine. Among the requirements which the petition alleged were violated are the following:

"All mines generating fire-damp shall be kept free of standing gas, and every working-place shall be carefully examined every morning with a safety-lamp by a competent person, before any workman is allowed to enter therein.

"Mines generating fire-damp shall be kept free of standing gas, and every working-place shall be carefully examined every morning with a safety-lamp by an examiner or fire-boss before miners or other employés enter their respective working-places. Said examiner or fire-boss shall register the day of the month at the place of the workings, and also on top, in a book which shall be kept in the weighmaster's office for such special purpose; and as proof of inspection, he shall daily record all places examined in said book, and in case of danger where fire-damp may have accumulated during the absence of any person or persons employed therein, said examiner or fire-boss must notify the miners or those employed therein, or those who may have occasion to enter such places. And the hydrogen or fire-damp generated therein must be diluted and rendered harmless before any person or persons enter such working or abandoned part of the mine with a naked light.

"Boreholes shall be kept not less than twelve feet in advance of the face of every working-place, and when necessary, on the sides, if the same is driven toward and in dangerous proximity to an abandoned mine suspected of containing inflammable gases, or which is inundated with water." (Gen. Stat. 1909, §§ 4986, 5006, 4987.)

The answer consisted of a general denial and pleas of assumption of risk and contributory negligence. To the question, "If you find for plaintiff, on what act or acts of negligence do you base your verdict?" the jury replied, "They did not comply with the law."

At the threshold of the inquiry the plaintiff was met

by the objection that there was a defect of parties plaintiff. The statute reads as follows:

"For any injury to person or property occasioned by any violation of this act, or any willful failure to comply with its provisions by any owner, lessee or operator of any coal mine or opening, a right of action against the party at default shall accrue to the party injured for the direct damage sustained thereby; and in any case of loss of life by reason of such violation or willful failure, a right of action against the party at fault shall accrue to the widow and lineal heirs of the person whose life shall be lost for like recovery of damages for the injury they shall have sustained." (Gen. Stat. 1909, § 4992.)

While the suit was properly commenced so far as the common-law cause of action was concerned, the verdict was based upon a breach of the mining law alone, and it is now urged that the rights of two persons besides the plaintiff, the lineal heirs of Thomas Cheek, have not been litigated or determined.

The statute does no more than create a right of action for loss of life sustained through violations of its provisions and designates the beneficiaries. No procedure is prescribed for the enforcement of the right, and whenever the legislature gives an action but does not designate the kind of action or prescribe the mode of procedure therein such action shall be held to be the civil action of the code of civil procedure and shall be proceeded in accordingly. (Civ. Code, § 752.) The result is that the mining statute takes its place among the provisions of the code of civil procedure relating to death by wrongful act and becomes subject to those provisions in all respects not differentiated by the mining statute itself. The action must be brought within two years; the damages can not exceed $10,000; and they are to be distributed in the same manner as personal property of the deceased. The action may be prosecuted by the personal representative of the deceased, but if no personal representative has been ap-

pointed it may be brought by the widow. (Civ. Code, §§ 419, 420.) In this case the widow and lineal heirs are the widow and children of the deceased, and consequently the entire proceeding takes the same form and course as if conducted under the general code provisions relating to death by wrongful act.

The defendant complains of the rejection of evidence which it offered at the trial. Some of this evidence may be considered briefly.

Experienced miners were asked to state, from their knowledge of the history of the southeast Kansas coal field, their experience in breaking into other abandoned mines, and their information as to what occurred when other abandoned mines were broken into, whether or not the explosion in question was unprecedented; whether it was an ordinary or usual occurrence or otherwise; and what had been encountered when other abandoned mines had been broken into. The court no doubt felt that if it undertook to investigate the history of the southeast Kansas coal field it might have great difficulty in concluding the trial. The question to which the evidence related was whether or not mine No. 7 was suspected of containing inflammable gases, and that subject was fairly capable of elucidation without the introduction of an indefinite number of collateral issues. The likelihood that an abandoned mine, when broken into, will contain inflammable gases depends upon the presence or absence of numerous conditions which must be understood before that mine can become a precedent, and it was scarcely practicable for the court to consider the cases of all abandoned mines in southeast Kansas which had been broken into and which were in the minds of the various witnesses. In the course of the trial it developed that mine No. 7 was characterized by conditions which made a consideration of other mines of slight importance. The defendant believed the evidence would tend to show that abandoned mines in that field do not generate or accumulate

explosive gases. That inference could be drawn only in the case of mines sealed up so that if gas did generate it could not escape. But beyond this, the statute quoted assumes that abandoned mines do generate such gases, and no amount of indirect and uncertain evidence of the kind proposed could contradict the event of March 18, 1911.

The evidence of several experienced miners was offered, based upon their experience in the southeast Kansas field and their knowledge of the location of No. 7 and the conditions existing in it when it was worked, that they would not have suspected it to contain fire damp and would not have kept boreholes in advance of the workings of No. 16 when approaching it. This evidence would have merely shifted the issue from the state of the minds of Jopling and Ryan, and their duty, to the state of the minds and the probable conduct of persons not charged with official responsibility in the observance of the laws enacted to protect the lives and limbs of mine workers. Besides this, the question whether mine No. 7 was suspected of containing fire damp and the question whether boreholes should have been kept in the face of the Little North entry of No. 16 were the very matters in controversy, to be determined by the jury from the facts, and the opinions of witnesses as to what they would have thought and done were irrelevant.

Testimony was rejected that the state mine inspector did not require operators to employ fire bosses prior to March 18, 1911. No neglect on the part of the state mine inspector to exercise his authority could excuse a violation of the law.

The plaintiff proved conversations with Jopling in which he made statements showing that he not merely suspected but expected that fire damp as well as black damp would be encountered when mine No. 7 was entered. The defendant offered to prove that in other conversations Jopling referred to black damp only and

did not refer to fire damp when he likely would have done so had it been in his mind. The offers were rejected. The court is of the opinion that the evidence should have been received, but it does not follow that the judgment must be reversed.

A perusal of the transcript, made necessary because each party contests the abstract made by the other, shows that the defendant did succeed in getting before the jury much evidence that the explosion was unprecedented; that upon breaking into other abandoned mines black damp only and not fire damp had been encountered; that mine No. 7 was not regarded as one in which fire damp was to be suspected; that black damp only was anticipated; that there were no fire bosses anywhere in the mining district; and that Jopling, in conversations regarding breaking into No. 7, mentioned black damp only and not fire damp. Special findings favorable to the defendant were returned upon some of these matters. The jury found specially that Ryan suspected fire damp in No. 7 and, if it were necessary, Jopling's attitude might be wholly disregarded. But besides all that has been said, the defendant did not regard the subject of sufficient importance to present any of the excluded evidence to the district court upon the hearing of the motion for a new trial, in the manner prescribed by the code of civil procedure. (Civ. Code, § 307.) Conceding, therefore, that the court should have been more liberal in the admission of testimony relating to the various matters which have been referred to, the defendant was not materially prejudiced and is not entitled to have the rulings of which it complains reviewed.

The jury returned, among others, the following special findings of fact:

"3. Was mine No. 7 before the explosion on March 18, 1911, suspected by the defendant, its officers or agents of containing inflammable gases? Ans. Yes.

17—89 KAN.

"5. When mine No. 7 was being worked, was it a gassy mine? Ans. Yes.

"17. Was the explosion caused by gas or gases coming through the hole into mine No. 16 from mine No. 7 and there mixing with air and being ignited? Ans. Yes.

"26. Did any gas exude from mine No. 7 into mine No. 16 before the hole was blown through between the two mines? Ans. Yes, we think so.

"27. How was the deceased, Thomas Cheek, killed? Ans. By an explosion of gas.

"36. Before March 18, 1911, was mine No. 16 a gassy mine, that is, generating fire damp, so that a fire boss was necessary? Ans. We consider it was.

"36. [37?] Before March 18, 1911, was mine No. 16 generating fire damp to such extent that it required examination in the working places every morning with a safety lamp by the examiner or fire boss before miners or other employees entered the working places? Ans. We consider it was.

"47. If a hole had been bored ahead 12 feet from the face, would the ordinary and usual place for such a hole to be bored have been at a point about the center of the entry and straight ahead? Ans. Yes.

"71. Before the shot was fired that blew through into No. 7, how thick was the body of coal between the two mines at that point? Ans. About 9 or 10 feet.

"72. Did John Jopling, the superintendent of mine No. 16, suspect that inflammable gas would be encountered on breaking into mine No. 7 from the Little North entry before the explosion? Ans. We think so.

"73. Did Francis Ryan, the pit boss of mine No. 16, suspect that inflammable gas would be encountered on breaking into mine No. 7 from the Little North entry? Ans. We think so."

The defendant argues that most of these findings are not sustained by the evidence. It is sufficient, of course, if they are sustained by some competent evidence, weight and preponderance being matters for the jury and not for this court. While every essential fact in the case was contested, there is abundant evidence not only to support the findings of fact but to establish liability on the ground that the working places

of mine No. 16 were not examined for gas each morning and that boreholes were not kept in advance of the face of the Little North back entry. The court has little time to spend in the discussion of disputed questions of fact and is not disposed to summarize, from a transcript of more than 900 pages, the testimony upon which the jury evidently relied; but some of the defendant's challenges may be noted, as briefly as possible, because of their bearing upon questions of law.

It is said that mine No. 7 was not a gassy mine while in operation, the only gas encountered being small quantities found after cutting through horsebacks, which are cracks in the coal veins filled with rock and clay. It is true that inflammable gas is generally found after penetrating horsebacks, but this field was noted for the number of horsebacks and slips and faults which it contained, and they were continually encountered in both No. 7 and No. 16. It was scarcely practicable to give the full history of mine No. 7, but numerous instances of men being burned at various times and in all parts of the mine were proven, and explosions of gas were so frequent that the miners became inured to them. A witness who worked in No. 7 testified:

"Q. Ever have any experience there with gas? A. Yes sir.

"Q. What? A. I got burned.

"Q. You never encountered inflammable gas except as you went through a horseback or fault? A. No sir.

"Q. What was the cause of your getting burned? A. Well, it was my own fault. I went in there and lit it.

"Q. And you knew that in advance? A. Yes sir.

"Q. And you had gone through a horseback and your knowledge as a miner informed you you were likely to find gas there? A. I knew it was there.

"Q. Then from your experience in the Kansas field what would you say as to mine No. 7 being just about the average run of mine? A. The average run out in that district.

"Q. Was it what you would call a gassy mine? A. Not any more than any of the rest of them.

"Q. From your experience in the southeast Kansas field there are very few mines that don't encounter horsebacks and faults? A. Yes, sir.

"Q. The fact is this field is full of them? A. Yes, sir.

"Q. And from practical experience you miners know you are going to encounter inflammable gas? A. Yes, sir.

"Q. You say that this field or district is noted for being full of faults and slips and horsebacks? A. Yes sir."

A witness who worked in the southeast part of mine No. 7, the part nearest to mine No. 16, testified as follows:

"Q. You find more gas after you pass through a horseback than you do while you are in it? A. Not necessarily.

"Q. Find plenty while in it? A. Yes, sir.

"Q. None of the gas you encountered was of sufficient quantity to be dangerous was it? A. Yes, sir.

"Q. Did it burn you? A. No, but it would if I had n't protected myself.

"Q. Well, like all other miners you protected yourself? A. If you want me to tell you I can tell you. I turned the room and drove it 30 or 40 feet and struck a horseback and I cut that and drove it 20 feet further and struck another two foot horseback and I cut through that and put in my shot and never encountered any gas at all, and next morning I dressed and went in there just like any other fool miner would do, and when I got in there it just rolled in a flame to the face, and I fell on my face, and it went clear back out through the other horseback.

"Q. That is customary, to roll to the face first? A. Yes, sir. The next morning I went in there and I was just a little bit dubious and I put my light on a crowbar and that went out clear to the entry and popped like a cannon, and the next morning there was n't any gas.

"Q. And that is your experience as far as the gas is concerned? A. Yes, sir, that part of gas. And that

is the reason I said it was not always necessary to go through a horseback to encounter gas."

Manifestly the jury were not concluded by the testimony of miners, so accustomed to peril that they accepted it as a matter of course, that mine No. 7 was not considered a gassy mine. The facts spoke for themselves; and the statute quoted was enacted to break up the practice of subjecting mine workers to such hazards, although they are only occasionally burned or killed.

Ordinarily in an operated mine, which is necessarily a ventilated mine, gas found upon penetrating horsebacks is not noticeable after from one to ten days. But coal is porous, and fire damp travels not only through coal but through other strata. Small feeders are found. Horsebacks may draw from long distances, and the evidence was ample to compel the conclusion that the generation of gas does not by any means cease concurrently with the discontinuance of work in a mine. The state mine inspector testified as follows:

"Q. Now have you a judgment, based upon your experience as a coal miner and experience and observation as a mine inspector, as to what produced the gas in mine No. 7, which you found had rushed through there at the time you were down there? A. I have.

"Q. What is that opinion? A. In mine No. 7, I learned that there was about six or eight entries and about one hundred rooms standing in that section of the mine. My opinion is that a little gas would be oozing out of that coal for a period of four years about, and sealed up, excluded from the air, and the decomposition from whatever vegetable matter and other substances that might be there, such as props, etc., and in the presence of water, would form carbureted hydrogen gas.

"Q. And is it an inflammable gas? A. Yes, sir.

"Q. From your observation and experience in and about coal mines, and based upon your experience as a miner and mine inspector, have you an opinion

whether or not the mines in this mining district generate more or less gas?   A.   I have.

"Q.   What is that opinion?   A.   I think they generate carbureted hydrogen gas.   .

"Q.   And is that also true of abandoned mines as well as active mines?   A.   It is."

Indeed, the court might well have taken judicial notice of the fact, which was recognized by the legislature when it framed the statute relating to boreholes.

The defendant strove to show that after mine No. 7 was abandoned gas could not be bottled up in the southeast portion of the mine, but physical conditions naturally and necessarily productive of such a result were disclosed by the plaintiff's evidence.   The result is that independently of the confirmatory explosion of March 18, 1911, the jury were warranted in believing that this mine generated fire damp in dangerous quanti- . ties, and that the portion nearest to No. 16 was left to fill with the gas without any outlet for its escape.

It is said there is no evidence to prove that gas exuded from mine No. 7 into mine No. 16, and that a fire boss and examinations of the working places of No. 16 were necessary.

Fire damp is lighter than air and rises to the roof of open spaces in which it is found.   Cahill encountered gas on the 16th of March in the back entry and lighted it six or seven times.   He would light it about three feet from the face and it would flash back eight or nine feet.   He told Lundy that there was gas in there and for him to be careful.   He was not able to say whether or not the gas came from the face of the entry.   While working at the face of the back entry Lundy lighted gas twice on the 18th and twice on the 16th, and on the 16th warned another employee, who approached with an open light, not to come any closer or he would get into gas, and to be careful with his light.   After he came out of the mine on March 18, and before Burgin and Cheek went down, Lundy told them to be careful, that there

was a little gas in there. Although pressed to do so he several times refused to say, as a practical miner, that the gas did not come from the old mine. On the 16th a mule driver set fire to gas 100 feet back from the face of the entry where Cahill was working. Allen Harrison worked in the mine on March 15, 16 and 18, turning a room at the extremity of the straight entry. He drilled the last hole for a shot before the explosion occurred. He put his lamp to the hole three times and lighted gas. A short time before the explosion the coal was set on fire by burning gas at the face of the straight entry, and on other occasions miners were burned by setting fire to gas with their open lamps. Considering the migratory nature of the gas, these facts warranted the inference that it did exude from No. 7 into No. 16.

The statute does not require that mines must generate gas in dangerous quantities before the precautionary measures prescribed by sections 4986 and 5006 must be observed. All mines generating fire damp shall be carefully examined every morning with a safety lamp by a fire boss before the miners and other employees enter their respective working places. This means mines generating fire damp in appreciable quantities, the purpose being to cause the gas to be detected as soon as it appears, so that danger from it may be averted. In this case Cahill and Lundy were left to look out for themselves and to warn each other and other employees, including the shot firers, of danger.

It is said that the failure to examine for gas was not a proximate cause of the death of Cheek. Under the mining statute, as under the factory act, the terms proximate cause, remote cause, efficient cause, and the like, are not properly applicable in discussing the relation of an omission of duty to an event. (*Alkire v. Cudahy*, 83 Kan. 373, 111 Pac. 440.) Under the mining statute, if loss of life occur by reason of a violation of its terms or a willful failure to comply with its provisions, liability attaches.

The requirement of the statute that working places be examined for gas every morning was designed to prevent injury from gas accumulating in such places while the workmen are away, but that was not its full purpose. The full purpose was to protect mine workers from explosions of quantities of gas which a careful examination by a competent person would reveal. In this case the explosion occurred because Jopling and Ryan neglected to avail themselves of clear evidence of the impending danger. They did not know how near they were to No. 7, although they had been expecting to break through at any time for a number of days before March 18. By far too much gas was manifesting itself in the Little North entries. While a small slip had been found some seven or eight feet back, the quantity of gas was too great and its disclosure too persistent to be satisfactorily accounted for by the horseback theory; yet the information which regular inspections would have furnished was not utilized. The jury were warranted in believing that careful examinations by a competent person would have indicated that this gas was a portion of a large volume which was saturating the thin wall of coal separating the two mines. This being true, the explosion was caused by the omission to make such examinations, in the same sense that it was caused by failure to drill revealing boreholes, and liability under the statute ensued.

There is no dispute that no boreholes were driven in advance of the face of either entry. It is argued, however, that if that had been done the boreholes would not have disclosed the pent-up gas in the abandoned mine. The argument is based in part upon the claim that the distance between the two mines was much greater than the jury found it to be.

When the state mine inspector was able to do so after the explosion, he made his way to the break through, removed the temporary stopping from the crevice, examined it, and looked through into No. 7, with the aid

of an electric searchlight.  He testified that the pillar of coal left standing between the two mines after the shot was fired was about two and one-half feet thick. Then there was a slab of coal which had been cracked loose by the shot and left standing in No. 7, and altogether the distance between the two mines was, in his judgment, three and one-half feet.  The shot which caused the break through was placed five and one-half feet deep.  The manner in which the shot spent its force was described, and from this evidence the jury found that the distance between the two mines before the shot was fired was nine or ten feet. ˙Ryan himself placed it at only thirteen feet.  On cross-examination, the state mine inspector freely conceded that his estimate of distance was not perfectly accurate, but he said that a drill hole twelve feet deep would at least have gone to very soft coal if it did not go completely through; that the gas in No. 7 was very apt to seep through the wall of coal into No. 16 without any boreholes, and that with twelve-foot boreholes it could have been readily detected.

This evidence was corroborated in many ways, but coming as it did from an experienced and impartial state official it would support the findings and verdict without corroboration.

It is urged that there is no evidence that Ryan suspected mine No. 7 of containing inflammable gases and no evidence that he willfully failed to comply with the provisions of the law relating either to boreholes or examinations for gas.  The state of Jopling's mind on the subject may be left out of account.

The word "suspected," as used in section 4987 (quoted *ante,* p. 253), has its usual and ordinary signification. It need not involve knowledge or belief or likelihood.  If Ryan entertained even a slight or vague idea of the existence of inflammable gas in No. 7, no matter how it arose, whether on weak evidence or no evidence at all (Webster's New International Dictionary, title, sus-

pect), his duty to act under the statute was imperative.

In a conversation with the shot firers, Burgin and Cheek, two or three days before the explosion, Ryan said:

"We expect to cut through pretty soon into No. 7, and if you should happen to encounter anything, go out through the 4th east. Don't go out the main traveled way, as you have been doing."

He did not speak of black damp as if that were the only kind of gas he had in mind, but used a broader term, which included fire damp as well. He had been pit boss of No. 7 and had full knowledge of all the conditions which prevailed there. He knew the topography of the mine. He knew that the southeast portion, lying next to No. 16, generated fire damp. He said he lighted gas there himself and on one occasion he wrapped up in linseed oil the head of a miner who had been burned there. On Tuesday or Wednesday before the explosion he recognized his duty under the statute by ordering boreholes to be placed in the faces of the Little North entries. He notified the men working in each entry and told them to notify their partners on the other shift. No doubt he was astounded at the quantity of gas which was released from No. 7, but the jury were perfectly fair to him when they accredited him with a notion that some fire damp might possibly be encountered there. It is insisted that he could not have suspected explosive gas in No. 7, because he went to the rescue of Burgin and Cheek with other men, for whose safety he was responsible, with open lights. No doubt the jury were satisfied that he believed the mine had been cleared of gas by the explosion.

Section 4992, quoted above (*ante*, p. 254), gives a right of action in case of loss of life occasioned by "any violation" of the act, or by "willful failure" to comply with its provisions. The legislature had in mind active

and passive conduct and intended to cover both. No voluntary act in violation of the statute is excused, and no inaction where the statute requires something to be done is excused unless it be involuntary. In the case of omissions neither bad purpose nor determined obstinacy is required, and one charged with the. duty to observe the statute, who intentionally suffers mining operations to proceed without taking prescribed precautionary measures when the circumstances demand that they should be taken, is guilty of a willful failure within the meaning of the law.

Ryan was foreman of the mine and said he kept in close touch with the work. He was back to the face of the Little North entry on Wednesday, on Thursday, and on Saturday, the day of the explosion. No fire-boss had ever been appointed to examine the working places of the mine for fire damp, and he said that there were no boreholes in the face of the entry the last time he was there. Under these circumstances it is clear that he voluntarily chose to disregard the plain provisions of the law.

Error is assigned because the court refused to give certain instructions to the jury requested by the defendant. Two of these instructions depended upon a finding that mine No. 7 was not suspected of containing inflammable gases, and the third depended upon a finding that a drill hole twelve feet deep would not have reached through the pillar of coal between the two mines. The jury having returned contrary findings, the propriety of these instructions need not be considered.

Instructions given to the jury are criticised.

The court advised the jury that assumed risk and contributory negligence are not available as defenses to the charge that the defendant violated the safety provisions of the mining law. This instruction was based upon the decisions of this court in the following cases:

Assumed risk: *Manufacturing Co. v. Bloom,* 76 Kan.

127, 90 Pac. 821; *Fowler v. Enzenperger,* 77 Kan. 406,. 413, 94 Pac. 995; *Brick Co. v. Stark,* 77 Kan. 648, 95 Pac. 1047; *Lewis v. Barton,* 82 Kan. 163, 107 Pac. 783; *Bailey v. Spelter Co.,* 83 Kan. 230, 109 Pac. 791; *Sibley v. Cotton-mills Co.,* 85 Kan. 256, 259, 116 Pac. 889.

Contributory negligence: *Caspar v. Lewin,* 82 Kan.. 604, 109 Pac. 657; *Gambill v. Bowen,* 82 Kan. 840, 109· Pac. 670; *Bailey v. Spelter Co.,* 83 Kan. 230, 109 Pac. 791; *Sibley v. Cotton-mills Co.,'* 85 Kan. 256, 259, 116' Pac. 889; *Smith v. Street Railway Co.,* 86 Kan. 982, 112· Pac. 896.

The statute makes no exception of the widows and lineal heirs of negligent persons who lose their lives. through nonobservance of its provisions and conse-quently the court can make none.

It is said that legislation to protect a person from the· consequences of his own negligent conduct is not justi-fiable as a constitutional exercise of the police power. This question was fully considered in the Caspar-Lewin case. It is not the purpose of the mining statute merely to protect miners from the consequences of their own· carelessness. It bears the same relation to the busi-ness of mining that the factory act bears to the business. of manufacturing. Concerning the purpose of the fac-tory act, the court said:

"It is to stop the insufferable waste of human life· and limb which has been the universal accompaniment of the conduct of manufacturing industries. The law is a police regulation, adopted to reform the inhumanity of factory methods and to prevent the casting into the· world of dependent cripples and widows and orphans left without means of support. This purpose includes. the reduction of the number of casualties to the careless. as well as to the prudent. If the prescribed precautions. be taken and the required safeguards be installed, kill-ing and maiming will cease, or at least will be reduced to a minimum." (*Caspar v. Lewin,* 82 Kan. 604, 629,. 109 Pac. 657.)

The court instructed the jury that a corporation must act through agents; that if a duty which the corporation must perform be delegated to one of its agents, he becomes a vice principal, taking the place of the corporation itself; and that the corporation is liable if he fails to perform the duty delegated to him. It is said that the instruction is erroneous, as applied to the facts of this case, in that if a miner has been ordered by the mine foreman to place boreholes in the face of an entry and the miner has failed to do so the corporation is not liable for a willful failure to comply with the law unless the foreman knew that his order had not been obeyed, or should have known the fact in the exercise of reasonable diligence. The statute is not open to such an interpretation. Given dangerous proximity to an abandoned mine suspected of containing inflammable gases, boreholes must be kept not less than twelve feet in advance of the work. The defendant was obliged, as a matter of law, to know the boundaries of its mines and the thickness of the wall of coal between them. (*Plaster Co. v. Reedy,* 74 Kan. 57, 85 Pac. 824; *Little v. Norton,* 83 Kan. 232, 109 Pac. 768.) From the time the proximity of one to the other became dangerous the duty was absolute not only to drill boreholes but to keep them drilled in advance of the work, and that obligation could not be discharged by giving an order which was disobeyed. ·Whenever the law requires the employer himself to take a precautionary measure for the safety of his employees it is not enough that he make provision for the performance of the act. The precautionary act itself must be performed. (*Brick Co. v. Shanks,* 69 Kan. 306, 76 Pac. 856; *Brice-Nash v. Salt Co.,* 79 Kan. 110, 98 Pac. 768; *Hanson v. Railway Co.,* 83 Kan. 553, 112 Pac. 152.)

Besides this, the objection to the instruction is not well founded because Ryan admitted that he knew on Saturday that the boreholes which he had ordered on Tuesday or Wednesday had not been drilled.

The defendant argues that the case was confused by the multiplicity of issues presented, both by the pleadings and by the instructions. The plaintiff, however, had the right to plead as many grounds of negligence as she believed contributed to her husband's death, whether based on the common law or the statute, to sustain them, if possible, by proof, and to have the law applicable to her entire case stated to the jury. (*Sibley v. Cotton-mills Co.,* 85 Kan. 256, 116 Pac. 889; *Warfield v. Morgan,* 86 Kan. 524, 121 Pac. 489; *Raines v. Stone,* 87 Kan. 116, 123 Pac. 871.) All this was done in an orderly manner, and there is nothing in the result to indicate that the jury were led astray because of the magnitude or intricacy of the proceeding, or the joinder of common-law and statutory causes of action.

It is argued that the mining statute, which covers the conduct of the mining industry quite fully, entirely supersedes the common law so far as it relates to the duty of a mine owner or operator to furnish his employees a safe place in which to work. In the Caspar-Lewin case it was said:

"The common law already gave a right of action to some employees under some circumstances. If the master failed to exercise reasonable care to provide reasonable safeguards and if the servant did not assume the risk and if he was not guilty of contributory negligence, then a liability existed. The sole purpose of the statute was to wipe out this narrow and conditional liability and substitute another." (82 Kan. 604, 628.)

The court was there speaking of the nature of the liability imposed by the factory act, and was endeavoring to point out the distinctions between that liability and liability at common law. The destruction of one kind of liability and the creation of another in its stead were not under consideration. The factory act and mining act give additional rights and impose additional duties beyond those recognized by the com-

mon law (*Gibson v. Packing Box Co.*, 85 Kan. 346, 353, 116 Pac. 502), but the common law was not abrogated. If, however, the common law were superseded by the statute the defendant's situation would not be improved, because the jury based its verdict on noncompliance with the statute.

The court instructed the jury as follows:

"You will note that the language employed in the statute as to the boring of holes in advance of the working place is 'not less than 12 feet in advance of the face of every working place.'

"Now I instruct you that if you find from the evidence in this case that the defendant was driving an entry, or working place, toward and in close proximity to an abandoned mine suspected of containing inflammable gases, then it was the duty of said defendant to make bore-holes such distance as was reasonably necessary to ascertain whether or not such abandoned mine did in fact contain inflammable gases. It was not required to drill ahead an unreasonable distance, nor can it be said that a drilling 12 feet ahead only, would be sufficient. If the conditions and circumstances were such that it would appear that the dangerous and unsafe condition would have been discovered, and the place made safe by drilling a reasonable distance beyond a distance of twelve feet."

The writer is of the opinion that the instruction correctly interpreted the statute which prescribes a minimum and not a maximum measure of protection to miners working in dangerous proximity to an abandoned mine suspected of containing inflammable gas. The other members of the court are of a contrary opinion, and the decision is that the requirement of the statute is satisfied if 12-foot boreholes are kept in advance of the working places. The error committed in giving the instruction is wholly immaterial, however, since boreholes 9 or 10 feet deep would have reached the face of No. 7 and none whatever were drilled.

The court refused to submit to the jury several special questions asked by the defendant designed to

develop the fact that it was not the usual or customary practice in the southeast Kansas coal field to bore ahead when approaching abandoned mines. The defendant's conduct could not be justified or palliated by any custom of mine owners to disregard the law. Some other questions were not submitted, but if answers favorable to the defendant had been returned to them the verdict would not be affected. For the same reason no error was committed in refusing to require the jury to answer certain questions more specifically.

Other assignments of error have been considered and none of them requires a reversal.

The judgment of the district court is affirmed.