No. 41,037

JOHN L. SULLIVAN, Administrator of the Estate of Loraine Eugene
Sullivan, Deceased, *Appellant*, v. DAVID DAVIDSON, *Appellee*.

(332 P. 2d 507)

Opinion filed December 6, 1958.

*R. L. Letton*, of Pittsburg, argued the cause, and *R. L. White*, of Pittsburg,
was with him on the briefs for the appellant.

*C. R. Stauffacher*, of Columbus, argued the cause and was on the briefs
for the appellee.

The opinion of the court was delivered by

PRICE, J.: This was an action for wrongful death by electrocution.

The trial court held that plaintiff's evidence established that de-
cedent had assumed the risk of the employment and was guilty of
contributory negligence as a matter of law, and sustained de-
fendant's demurrer thereto.

Plaintiff has appealed, and the sole question involved is the cor-
rectness of that ruling.

The decedent, Loraine Eugene Sullivan (hereafter referred to
as Gene), was employed as a general farm hand by defendant
Davidson, a farmer of Cherokee county. On July 29, 1955, while
loading some aluminum pipes on a wagon in connection with de-
fendant's irrigation operations, Gene was electrocuted when one of
the pipes being handled by him came in contact with an overhead
electric power line. This action was brought by his father as ad-
ministrator of his estate.

The petition, after narrating the factual background of the mat-
ter, all of which will be referred to in our discussion of plaintiff's
evidence, alleged that Gene's death was the direct and proximate

result of the negligence and carelessness of defendant in that defendant negligently and carelessly:

"(a) Failed and neglected to furnish his employee with a reasonably safe place in which to perform his duties in his employment by defendant;

"(b) Failed and neglected to advise and warn his employee, Loraine Eugene Sullivan, of the danger of placing and handling said aluminum pipe in an upright position beneath or near to said high-voltage electric transmission wires, notwithstanding defendant's superior knowledge of such danger;

"(c) Drove, operated and stopped said tractor and farm wagon in a loading position directly beneath said high-voltage electric transmission wires, notwithstanding defendant's knowledge of the danger of so doing to the employee of the defendant, Loraine Eugene Sullivan;

"(d) Directed his deceased employee to reverse ends of the lengths of pipe by placing and handling the same in an upright position;

"(e) Failed to remain at the place of work of said employee and direct the work being performed, notwithstanding the hazard and danger involved in the performance of said work, without direction and supervision;

"(f) Failed to remain at the place of work of said employee and assist in the work then and there being performed, notwithstanding the hazard and danger in the performance of said work by the deceased employee, Loraine Eugene Sullivan, without assistance."

Defendant's demurrer to the petition being overruled, an answer was filed which, among other things, denied allegations of defendant's negligence and alleged that Gene had assumed the risk of his employment, and that his death was proximately caused and contributed to by his own negligence and disregard for his own safety, thus barring recovery.

Plaintiff's reply denied allegations of the answer relating to assumption of risk and contributory negligence, and upon the issues thus joined the parties proceeded to trial before a jury.

Due to the nature of the case and the question presented, we summarize the evidence in detail.

The manager of SEKan Electric Cooperative Association testified the company maintained high-voltage electric transmission lines in Cherokee county, and at the scene of Gene's death, which was about six miles northeast of Columbus. The high-voltage line in question was completed in May, 1955, to serve an irrigation well on defendant's farm. The first pole west of the driveway into the field in question was a thirty-five-foot pole, and the first pole east of the driveway was a thirty-foot pole, with a span between them of 300 feet. In that length of span there would be a sag in the wires. The "hot" wires carried 7,200 volts from the phase wire to the ground. The overhang clearance at the point in the driveway from the

ground to the neutral wire was approximately nineteen feet, and the clearance in the driveway from the ground to the "hot" wires was twenty-one feet eight inches. Roads in the rural district required eighteen-foot clearance, and there were no obstructions of the transmission line at the point where the roadway went into the field.

The lineman for the electric company went to the scene in question shortly after Gene's death, and he observed a length of aluminum pipe approximately thirty feet long and three inches in diameter upon which there were markings "significant" to an electrician. These markings were a black smudge indicating a short circuit to the ground. A small arc indicated to him that the electricity flowed through the pipe from that point to the ground. When high voltage goes to the ground it causes an arc. The smudge was close to the end of the pipe. In his judgment, the arc from the hot wire to the pipe was not over a quarter of an inch and the pipe had to come within that distance, or even closer, in order to make an arc. If the pipe had touched the hot wire the effect would be practically the same. There was corn growing in the field but none was under the electric line.

The coroner and a physician testified that the cause of death was electrocution.

Gene's mother testified that he was twenty-eight years of age at the time of his death; that he was one of ten children; was about six feet three inches tall; weighed about 160 pounds; was in good health; that he had completed eighth-grade education; was of good intelligence; that he had been engaged in farm work practically all of his life except for fifteen months when he was in the military service in World War II from which he was discharged as a sergeant, and that he had worked for defendant Davidson about eight years.

Gene's father, the plaintiff, testified that Gene had gone through the eighth grade in school; had helped him on the farm for a few years; went into military service in 1945, and upon his return became employed by defendant in general farm work; and that he had never married and had not worked at any trade or occupation other than as a farm laborer except for a period of a week or two when he worked on a pipeline in Oklahoma. He described Gene as weighing about 180 pounds and as being strong and robust. He went to the scene in question and noticed the section of aluminum pipe

lying a short distance west of the entrance into the field and not over four feet from the wagon, which was a four-wheeled trailer or farm wagon with a flat bed, and which was parked about directly under the electric transmission lines. He later discussed the tragedy with defendant and quoted defendant as saying that he and Gene were taking up the pipe from the irrigation line and were taking it up to the wagon to be loaded; that they were placing it on the wagon so a certain end would be to the front so that when they assembled the pipe again it would be in the right place; that if it was not right when they carried it to the wagon they would "upend" it and turn it over and place it on the wagon with the correct end forward. He further quoted defendant as saying that he (defendant) had driven the wagon to the location in question and had parked it under the transmission lines; that while he and Gene were working with the pipe he (defendant) left for a few moments in order to help a neighbor who was having car trouble, and that when he returned to the scene Gene was lying on the ground dead. This witness further testified that Gene had driven tractors, including the one owned by defendant which pulled the wagon in question, and that when he went to the scene of death he noticed corn growing in the field but that in the entrance from the road into the field it was clear and there was nothing to obstruct his view in seeing the electric wires overhead.

Defendant Davidson was called as a witness on behalf of plaintiff and testified as to matters in issue. At the conclusion thereof, and plaintiff having rested his case, defendant demurred. The court indicated it felt the demurrer should be sustained, but granted plaintiff's request for leave to reopen for further proof by recalling defendant as plaintiff's witness for further testimony. The substance of defendant's testimony as plaintiff's witness was as follows:

Gene had been in his employ as a general farm laborer for about eight years and the two of them had been engaged for two or three years in irrigating a part of the farm land. In so doing a five or six-inch main line would be run into the center of a field and from this line they used three-inch aluminum pipes laterally. Each day it was necessary to move the pipes and ordinarily took about six days to do an entire field. Formerly, twenty-foot lengths of lateral pipe were used, but about a week prior to the date of Gene's death they had commenced using thirty-foot lengths. Each of these weighed about twenty pounds. In moving the lateral lines from one position

to another the pipes were disassembled and they moved them either by putting them on the wagon or by carrying them over their shoulders. In loading the pipes on the wagon the usual practice was to place them so that the coupling ends were at the front of the wagon which made them more uniform to handle when unloading and recoupling. It sometimes happened that a pipe was placed on the wagon wrong-end-to, which necessitated it being reversed. Normally this was done by carrying the pipe into the clear and turning it around. On occasions, however, the position of the pipe on the wagon was reversed by "upending" it.

On the day in question defendant and Gene were engaged in moving thirty-foot lengths of pipe from one field to another. The wagon was pulled by a tractor driven by defendant. He turned in off the road on the driveway into the field and stopped inside the fence and parallel thereto at a spot directly under the transmission lines. Gene had ridden on the drawbar of the tractor right behind the seat. No one else was helping them, and, as each was familiar with the work being done, and there being nothing new or unusual about it there was no particular conversation between them concerning their work or how it was to be done. There was a clearing at the spot where the tractor and wagon were parked. Both were familiar with the field, had worked there before, and were aware of the electric transmission line, but apparently neither noticed that it was directly overhead and nothing was said about it. There was nothing to obstruct their view of it, however. Gene was fully familiar with his work and how it was to be done, and was given no instructions or directions by defendant. Earlier that morning defendant had seen Gene upending thirty-foot lengths of pipe in reversing their position but had said nothing about it. Had defendant not pulled into the field with the tractor and wagon he would have blocked the road or else would have been forced to drive on down the road a distance of about 200 feet, which would have necessitated the pipe being carried that distance. Shortly before noon on the bright sunny day in question, defendant left the spot where the pipe was to be loaded in order to assist a neighbor in starting his car. Gene proceeded about his work to get the pipe and load it, and when defendant returned in about ten minutes he found Gene lying on the ground dead, the victim of electrocution.

At the close of all of plaintiff's evidence defendant again interposed his demurrer. In sustaining it the trial court stated as follows:

"These cases, of course, are primarily cases which rest upon their own facts. In the case cited it is pointed out specifically that the plaintiff had been told that the shaft was uncovered but that he had no knowledge the revolving shift would hurt him as it did. In this case also they point out another decision where a farm hand used kerosene on a burning torch and an explosion occurred and they point out the demur was sustained there and that the Court noted it was a matter of common knowledge that kerosene was highly combustible, and so on. It seems to me whether you call it contributory negligence or assumption of risk in this case that everything complained of was perfectly open and obvious and the testimony clearly shows that that pipe had to come in virtual contact with the wire. It is not a case where the wire may have arced over a considerable distance. It seems to me that the evidence does show contributory negligence and assumption of risk as a matter of law. So that will be the ruling and the demur will be sustained."

We consider it unnecessary to take up and discuss separately each of the numerous decisions to which the parties direct attention (*Nolan v. Hebrew*, 177 Kan. 363, 365, 278 P. 2d 1011), for, as was said in *Siegrist v. Wheeler*, 175 Kan. 11, 16, 259 P. 2d 223, it must be remembered that every negligence action depends upon the factual situation disclosed by the record on which it is decided and that other decisions are of little value as legal precedents unless, as rarely occurs, the governing facts and circumstances are similar.

General rules and principles governing negligence actions have been stated so many times that we will not burden this opinion with repetitious citations, other than to mention the often-cited case of *Cruse v. Dole*, 155 Kan. 292, 124 P. 2d 470, and to quote the first three paragraphs of the syllabus:

"1. Contributory negligence is conduct on the part of a plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. It is conduct which falls short of the standard to which a reasonable man should conform in order to protect himself from harm.

"2. When the facts relating to contributory negligence are such that men of reasonable minds might reach different conclusions, the question is for the trier of the fact, otherwise it is one of law.

"3. While the general rule is that the burden of establishing the plaintiff's contributory negligence rests upon the defendant, if the plaintiff's own evidence shows him guilty of negligence which precludes his recovery, the defendant may take advantage by demurrer."

Although the trial court indicated in some of its prior remarks that it considered defendant to have been negligent in parking the wagon under the transmission lines, inasmuch as its ultimate ruling was not based on the ground of negligence or freedom from negli-

gence on the part of defendant, we pass that question as it is unnecessary for a decision. We also pass the question whether Gene assumed the risk of the employment, for it is clear from the evidence that his death resulted from his own negligence. (*Sebaugh v. City of Norcatur,* 130 Kan. 494, 496, 287 Pac. 238.)

There were no eyewitnesses to this tragic death, but, from the evidence and physical facts established, there can be no question as to just what happened and how death occurred—and it is not contended otherwise. In loading a pipe "correct-end-to" on the wagon Gene simply "upended" it instead of swinging it around horizontally. In so doing, the pipe came in contact with, or very close to, a "hot" wire which was twenty-one feet eight inches from the ground. He was an intelligent and experienced man, was thoroughly familiar with the field, the work he was doing and the manner of performing it, and knew the location of the transmission line, the view of which was unobstructed. There was no hidden peril—it was patent and obvious—and the danger of electricity is a matter of common knowledge to every adult of ordinary intelligence.

The evidence and physical facts of this case lead to but one conclusion—had Gene handled the pipe in the normal and ordinary manner it would not have come in contact with the electric wire. His manner of handling it fell below the standard to which, under the circumstances, a reasonable man should have conformed for his own protection and to save himself from harm. Had it not been for his own contributory negligence death would not have resulted. Under the wrongful-death statute (G. S. 1957 Supp. 60-3203) an action may be maintained by the personal representative of the deceased only in cases where the deceased, had he lived, could have maintained an action against the alleged wrongdoer.

The ruling of the trial court sustaining defendant's demurrer to plaintiff's evidence was correct and is affirmed.

ROBB, J., dissents.

WERTZ, J. (dissenting): I am unable to agree with the majority opinion of the court and I will attempt to briefly set forth my views regarding the questions on which I differ. It must be remembered this is an appeal from an order sustaining defendant's demurrer to plaintiff's evidence. There has been no complete trial. Before analyzing the evidence presented by plaintiff, it is well to emphasize

certain well-established and often-repeated principles of law governing a ruling on a demurrer to a plaintiff's evidence.

*First,* in testing the sufficiency of evidence as against a demurrer, the court shall consider all of plaintiff's evidence as true, shall consider that favorable to plaintiff, together with all reasonable inferences to be drawn therefrom, and disregard that unfavorable to plaintiff, and shall not weigh any part that is contradictory nor weigh any differences between his direct and cross-examination, and if, so considered, there is any evidence which supports or tends to support plaintiff's case on any theory, the demurrer should be overruled. A few of our more recent cases adhering to this rule are: *Kendrick v. Atchison, T. & S. F. Rld. Co.,* 182 Kan. 249, 320 P. 2d 1061; *Brent v. McDonald,* 180 Kan. 142, 300 P. 2d 396; *Harvey v. Palmer,* 179 Kan. 472, 296 P. 2d 1053; *McCracken v. Stewart,* 170 Kan. 129, Syl. ¶ 1, 223 P. 2d 963; *Fry v. Cadle,* 171 Kan. 14, 229 P. 2d 724; *Blankenship v. Fraker,* 173 Kan. 438, 439, 249 P. 2d 683; *Revell v. Bennett,* 162 Kan. 345, Syl. ¶ 1, 176 P. 2d 538; *Huggins v. Kansas Power and Light Co.,* 164 Kan. 27, 187 P. 2d 491; *Gabel v. Hanby,* 165 Kan. 116, Syl. ¶ 1, 193 P. 2d 239; *Samms v. Regier,* 167 Kan. 556, 207 P. 2d 414; *Hukle v. Kimble,* 169 Kan. 438, 441, 219 P. 2d 434; *Schneider v. Stewart,* 170 Kan. 158, 163, 223 P. 2d 698; *Cain v. Steely,* 173 Kan. 866, Syl. ¶ 3, 252 P. 2d 909; *Siegrist v. Wheeler,* 175 Kan. 11, Syl. ¶ 1, 259 P. 2d 223; *Messinger v. Fulton,* 173 Kan. 851, 252 P. 2d 904; *Hill v. Southern Kansas Stage Lines Co.,* 143 Kan. 44, 53 P. 2d 923. Other cases holding to the same effect may be found in 5 Hatcher's Kansas Digest [Rev. Ed.], Trial, § 151, and West's Kansas Digest, Trial, § 156 (2) and (3).

*Second,* it is also a well-established rule in this state, as well as in other jurisdictions, that in determining whether a plaintiff is guilty of contributory negligence when tested by a demurrer, the question must be submitted to the jury if the facts of record are such that reasonable minds, in the exercise of fair and impartial judgment, might reach different conclusions thereon. Moreover, the question whether a negligent act is the proximate cause of an injury, and whether an ordinarily reasonable, prudent man would have seen that injury might have occurred as a result of a negligent act, is also a question of fact for the jury. My views are best expressed in the opinion in *Lawrence v. Kansas Power & Light Co.,* 167 Kan. 45, 49, 204 P. 2d 752, wherein Mr. Chief Justice Harvey, speaking for this court stated:

"The legal questions here involved are so well settled in our law that they need not be labored. The actions were ones at common law in which plaintiffs sought damages alleged to have resulted from defendant's negligence, and defendant had pleaded contributory negligence of the plaintiffs. These are the kinds of actions in which each party is entitled to a trial by jury as a matter of right. *They should not be converted into trials by the court.* Negligence is the lack of due care. *The instances are relatively rare when the facts are such that the court should say that as a matter of law the negligence alleged has been established.* Before the court should make such a holding the evidence should be so clear that reasonable minds, considering it, could have but one opinion, namely, that the party was negligent. In these cases we think the contributory negligence of plaintiffs was clearly a question of fact for the jury." [Emphasis supplied.]

This reasoning has been reasserted and cited with approval in *Blankenship v. Fraker,* supra, p. 441; *Cain v. Steely,* supra, p. 873; *Fry v. Cadle,* supra, p. 17; *Siegrist v. Wheeler,* supra, p. 15; *Thompson v. Barnette,* 170 Kan. 384, 387, 227 P. 2d 120; and *Samms v. Regier,* supra. We said in *Mehl v. Carter,* 171 Kan. 597, 237 P. 2d 240:

"The question of negligence, including the determination of proximate cause, ordinarily rests in the province of the jury." (Syl. ¶ 3.)

See, also, *Rowell v. City of Wichita,* 162 Kan. 294, 176 P. 2d 590; *Atherton v. Goodwin,* 163 Kan. 22, 180 P. 2d 296. Many other cases of like effect may be found in 4 Hatcher's Kansas Digest [Rev. Ed.], Negligence, §§ 72 to 75, incl., and West's Kansas Digest, Negligence, § 136 (9), (14), (25) and (26).

It must also be borne in mind the rule in this jurisdiction is that ordinarily in the absence of convincing evidence to the contrary it will be presumed a deceased person exercised due care for his own safety. (*Long v. Foley,* 180 Kan. 83, 91, 299 P. 2d 63, and cases cited therein.)

The general rule is stated in 35 Am. Jur., Master and Servant, § 497, p. 914:

"In an action for the death of an employee, the presumptions which arise in favor of the instincts of self-preservation and the known disposition of men to avoid injury and personal harm to themselves constitute a prima facie inference, where there was no eyewitness to the accident, that the servant was at the time in the exercise of ordinary care, and was himself free from contributory negligence."

Being cognizant of this rule in favor of the plaintiff, let us review some of the facts. On the day in question, decedent and defendant were engaged in the task of moving an irrigation pipe line in a corn-

field from one location to another. This task consisted of dismantling the pipe line into separate thirty-foot lengths of aluminum pipe joints weighing twenty pounds each, and loading them onto a flat wagon with the coupling end of each joint to the front to facilitate reassembling the pipe line, which carried water to various parts of the field. When any of the joints were out of place, it was decedent's practice to upend the pipe, reverse it and replace it on the wagon. This was the first season in which the thirty-foot lengths of pipe were being used; twenty-foot lengths had been used in the past. In fact, the thirty-foot joints had first been used only a few days prior to the accident and there was testimony to the effect this was the first time decedent had ever handled irrigation pipe. Also, his death occurred on the first use of the longer pipe. The evidence disclosed the electric transmission line which paralleled the north end of the field where defendant was working had been recently reconstructed, with the job being completed late in May, about one and one-half months before the accident occurred. The clearance from the ground to the hot wires of the power line, which carried 7200 volts, was approximately twenty-one feet and eight inches.

Decedent and defendant had been loading pipe on the wagon. The defendant, while operating the tractor which pulled the wagon, stopped directly under the hot wires, then left immediately thereafter to help a neighbor. Defendant was aware of the fact the power line was there, but testified he did not notice he had parked directly under it. He also testified he knew the pipe was in thirty-foot lengths and was aware of decedent's action in upending the pipe on the day in question, but he said nothing to decedent about being parked directly under the hot wires. In short, defendant himself did not appreciate the danger, as indicated by his testimony:

"Q. When you knew that Gene [decedent] was going to load the pipe alone did you caution him about the nearness of the high line? A. It never occurred to me that the pipe would be off the ground or that the high line was there.

"Q. You gave him no instructions? A. No, sir."

"Q. Was anything said to you or done to indicate that Gene [decedent] noticed that? A. No, sir.

"Q. I think you have already said you made no comment because it didn't occur to you? A. Yes, sir."

Apparently, decedent upended the last length of pipe so as to get it on the wagon with the correct end to the front and it came in con-

tact with the hot wires; as a result, he was electrocuted. There was no eyewitness to the accident and there is not a shred of evidence to show decedent was aware the wagon was parked directly under the hot wires, or that he knew the amount of voltage carried by the power line, or that he appreciated and was aware of the danger.

In view of the presumption of due care on the part of deceased, which was not rebutted by convincing evidence or by any evidence except a presumption against deceased on the part of the court, I cannot bring myself to the conclusion that as a matter of law decedent was guilty of contributory negligence. A young man with only an eighth grade education, employed as a general farm hand, is not presumed as a matter of law to have scientific knowledge as to the number of volts passing through an electric power line paralleling a highway. The high line was not one of the ordinary risks of his employment as a general farm hand. The minds of reasonable men could well conclude deceased was unaware of the high line and its powerful current, especially when his employer parked the wagon containing the irrigation pipe directly under the power line. Decedent had the right to assume that he had been furnished a safe place to work; at least, it was a question for the jury to determine.

It is the duty of the master to furnish his servant a safe place in which to work and safe instruments for the work in which the servant is engaged. In addition, it has also been held it is not only the duty of the master to provide his employees a safe place to work, including structure and *surroundings,* and safe and reasonably suitable machinery, tools, implements and appliances with which to work, *but the employees may enter upon the discharge of their labor assuming these duties have been performed by the employer.* (*Fishburn v. International Harvester Co.,* 157 Kan. 43, 45, 46, 138 P. 2d 471, and cases therein cited. See also 4 Hatcher's Kansas Digest [Rev. Ed.], Master & Servant, § 33, pp. 53, 54; West's Kansas Digest, Master & Servant, § 101 [1].)

The deceased was not on equal terms with the defendant in estimating the hazards of his surroundings. Defendant had parked the wagon immediately under the high line and decedent had the right to assume defendant had furnished him a safe place to perform the work. Decedent was not obliged to institute an investigation for hidden menaces which could exist only by virtue of a breach of his master's duty to him; therefore, he had a right to proceed and was not guilty of contributory negligence in doing so as a matter of

law under the record in the instant case. Defendant testified that when he parked the wagon it did not occur to him the high line was there. This indicates even defendant did not appreciate the danger. Can deceased as a matter of law be held to a higher degree of care than defendant? Assuming deceased did know the wagon was parked below the electric power line, each joint of the irrigation pipe was thirty feet long, and the wires were only twenty-one feet and eight inches from the ground, and assuming further deceased was aware of some danger, the plaintiff is not barred from recovery because deceased may have "temporarily forgotten" or may not have understood the full import of the combined conditions and the danger created by his employer, the defendant.

We stated in *Wainscott v. Carlson Construction Co.*, 179 Kan. 410, 295 P. 2d 649:

"Mere knowledge of the danger of doing a certain act without a full appreciation of the risk involved is not sufficient to preclude a plaintiff from recovery, even though there may be added to the knowledge of danger a comprehension of some risk. *Moreover, knowledge of the offending instrumentality does not constitute contributory negligence as a matter of law.*" [Emphasis supplied.]

(See also *Harvey v. Palmer*, 179 Kan. 472, 296 P. 2d 1053; *Nave v. Hixenbaugh*, 180 Kan. 370, 304 P. 2d 482.)

We stated in *Zumbrun v. City of Osawatomie*, 135 Kan. 26, 10 P. 2d 3:

"But there is good authority for the view that temporary forgetfulness of a known danger does not necessarily constitute contributory negligence as a matter of law. In 45 C. J. 959 it is said:

" 'Expressions are found in many decisions to the effect that one who voluntarily exposes himself or his property to a known and appreciated danger is guilty of negligence; but while an important factor to be considered in all cases, it is generally held that the fact that one knew and appreciated, or in the exercise of ordinary care should have known and appreciated the danger and voluntarily encountered it, does not necessarily show negligence.'

"In 20 R. C. L. 111 it is said:

" 'When, however, the specific evidence submitted only goes to the extent of establishing knowledge of the defect, the question of his contributory negligence should not be withdrawn from the jury. Indeed, it can only be in rare cases, if ever, that the question becomes one of law. In other words, it is for the jury to determine whether knowledge of the physical characteristics of the offending instrumentality constituted a sufficient warning of peril to the plaintiff.' "

As to assumption of risk, in the interest of brevity it may be said that if the master does not perform the positive duty of providing the employee a safe place in which to work and such negligence is

the proximate cause of the death, the doctrine of assumed risk is not applicable. (*Plaster Co. v. Reedy,* 74 Kan. 57, 65, 85 Pac. 824; *Emporia v. Kowalski,* 66 Kan. 64, 71, 71 Pac. 232; *Schwarzschild v. Drysdale,* 69 Kan. 119, 76 Pac. 441; *Fishburn v. International Harvester Co.,* 157 Kan. 43, 44, 45, 138 P. 2d 471.)

The right of every individual citizen to a trial by jury is of ancient origin, and as now practiced is the result of a long process of development. Having early been regarded as a right, it was first guaranteed in England as such by the Magna Charta. It was introduced in this country by the English colonists who considered it a right under the English law; it is regarded as a basic and fundamental feature of American jurisprudence, and since the organization of our government has been incorporated in the form of expressed guaranties in the constitutions of both state and Federal governments. It is a substantial and valuable right and should never be lightly denied. The law favors trial by jury, and the right should be carefully guarded against infringements (50 C. J. S., Juries, 722), and, as stated, a trial court in the exercise of its prerogatives in determining questions of law, only, in this type of case should not usurp the power and function of the jury in weighing evidence and passing upon questions of fact. Instances are relatively rare where facts are such that the court should say as a matter of law negligence alleged has been established.

I am of the opinion the judgment of the trial court should be reversed and a new trial ordered.

Fatzer, J., concurs in the foregoing dissenting opinion.