No. 41,970

Cora Blackmore, Administratrix of the Estate of John B. Blackmore, Deceased, *Appellant,* v. Victor Auer and Letha Auer, *Appellees.*

(357 P. 2d 765)

Opinion filed December 10, 1960. 

*Walter J. Kennedy*, of El Dorado, argued the cause, and *W. H. Coutts, Jr.*, and *W. H. Coutts, III*, both of El Dorado, were with him on the brief for the appellant.

*L. J. Bond* and *Robert M. Bond*, both of El Dorado, argued the cause and were on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action for personal injuries suffered by a farm laborer in the course of his employment. The action is founded upon negligence and is brought against the farm employers who interposed a demurrer to the plaintiff's evidence which the trial court sustained. Appeal has been duly perfected from this ruling.

The only question presented is whether the plaintiff's evidence was sufficient to go to a jury.

This action was instituted by John B. Blackmore, as plaintiff, against Victor Auer and Letha Auer, his wife, for injuries he sustained while loading baled hay on a flat bed wagon in a hay field. The Auers employed Mr. Blackmore on a farm operated by them in copartnership in Butler County, Kansas.

The petition alleged in substance that despite *the muddy condition of the field* Victor Auer ordered the plaintiff to assist in the loading of baled hay by standing on a hayrack and stacking baled hay thereon by the use of a hay hook; that the field was not completely level, but consisted of rough, uneven terrain, and the plaintiff was ordered to load the hay while the hayrack was being pulled by a tractor over said rough and uneven land; that while the loading operation was thus proceeding, the plaintiff fell from said hayrack and as a result of the fall suffered a broken neck and other injuries for which he was hospitalized. The defendants were charged with the following acts of negligence:

"(a) In ordering that said hay be loaded onto said hay rack while the hay rack was being pulled over rough and uneven terrain.

"(b) In ordering the plaintiff to stand upon said hay rack and assist in the loading of said hay while said hay rack was being pulled over rough and uneven terrain.

"(c) In driving said tractor, and thus pulling said hay rack at a speed which was not reasonable and proper under the circumstances then prevailing."

The answer of the defendants traversed the issue of negligence and affirmatively pleaded contributory negligence on the part of the plaintiff; that the plaintiff, at the time of his injuries was "an experienced farm laborer and that he assumed all the risks of his employment, including the type of work he was doing at the time of his alleged injuries;" and that the plaintiff's injury was the result of an unavoidable accident.

The action was tried and resulted in a hung jury. Subsequently, the plaintiff, Mr. Blackmore, died and the action was revived in the name of the administratrix of his estate, who was substituted as party plaintiff. At the second trial the transcript of the testimony of the deceased plaintiff was read as his testimony, and this is the only evidence in the record on the second trial of the case as to how the injuries were sustained by the deceased plaintiff, Mr. Blackmore.

The evidence disclosed that Mr. Blackmore spent the first twenty years of his life on his father's farm in Barber County, Kansas. The next eight years he spent farming for himself on a farm in the State of Missouri. He then spent several years in occupations other than farming. At the time of the original trial of this action in June, 1958, Mr. Blackmore had spent approximately thirteen or fourteen years working for the defendants on their farm in Butler County, Kansas, as a general farm laborer. On the date of the accident, July 3, 1957, Mr. Blackmore was sixty-seven years of age.

The small field on the defendants' farm in which the injuries were sustained consisted of approximately three or four acres and was located just east of the defendants' home. The field was surrounded on one side by a river.

In the fall of 1956 this field was plowed and nothing further was done to the soil in preparation for seeding to oats, which was done in the spring of 1957. The oats were mowed in the "stiff dough stage" in late June of 1957. On the morning of July 3, 1957, the field was raked with a side delivery rake placing the oats in windrows so that they could be baled. Mr. Blackmore completed the job of raking at about 3:00 p. m., on that day. The oats were then baled by a son of the defendants with the assistance of Mr. Black-

more. The baling was completed at about 4:00 p. m., on the same day.

The defendants' son and Mr. Blackmore then went back to the field to load the bales, using an M-type International tractor, which is described as the large size, and attached it to a flat bed wagon which measured approximately fourteen feet long and seven feet wide. The wagon had rubber tire wheels, but it had no sides or back board. Mr. Blackmore stood on the flat bed wagon where he stacked the bales on the wagon while the defendants' son handed them up to him. The loading and stacking was done while the wagon was stopped. This procedure continued with the wagon and tractor being pulled to various places in the field and stopped close to the bales which were loaded on the wagon.

After approximately fifteen or twenty bales had been loaded onto the flat bed wagon in this manner, the defendant, Victor Auer, came to the field. He thereupon directed Mr. Blackmore to stay up on the wagon and load the bales, and he began driving the tractor. The defendants' son loaded the bales from the ground onto the wagon. By this procedure, instead of stopping when the bales were loaded, the tractor continued moving at a speed of approximately four miles per hour.

After approximately six or seven bales had been loaded onto the wagon in this manner the accident happened. The relevant testimony given by Mr. Blackmore on this point is as follows:

"Q. All right. Now, what was the condition of the ground at the time in this field?

"A. The ground was rough.

"Q. By 'rough' what do you mean?

"A. Bumpy.

. . . . . . . . . . . .

"Q. Just tell in your own words what happened after that.

"A. Well, I hollered at Mr. Auer to slow it down a little. It was going too fast.

"Q. All right. Did he slow the tractor down?

"A. Not that I could tell.

"Q. It continued to go at the same speed?

"A. Yes, sir.

"Q. How fast would you say that tractor was going when you yelled?

"A. About four miles—approximately four miles—

"Q. Four miles an hour?

"A. Yes, sir.

"Q. And then tell in your own words to the court and jury what occurred.

"A. Well, I hooked—Mr. Dwayne Auer throwed a bale on the wagon. I hooked into it. About that time it hit a bump and my hook came out of the

bale and I went on backwards on the ground and hit on my head and shoulders.

"Q. And that is while this tractor was going, in your judgment, four miles an hour?

"A. Yes, sir."

Other testimony elicited from Mr. Blackmore on cross examination was as follows:

"Q. Now, are those bales quite thick along there as you were picking them up or pretty badly scattered?

"A. They were scattered.

"Q. Mr. Auer have any trouble keeping up with the tractor?

"A. Mr. Auer was driving the tractor.

"Q. Well, one of the Auers? The son, did he have any trouble keeping up with the tractor going four miles an hour?

"A. No, sir, not necessarily.

"Q. I am not asking 'necessarily' did he have any trouble keeping up?

"A. No.

"Q. If the hook hadn't come out of the bale you wouldn't have fallen would you?

"A. Why sure I wouldn't have fell.

"Q. Did you make that statement, that what caused you to fall was the hook slipping out, to any other person?

"A. I did to my wife.

"Q. Did you fall off the rear end of the truck or side?

"A. Side.

"Q. You fell off the side? You didn't fall over the rear end?

"A. No sir, not off the rear end.

"Q. You know how high the truck bed is from the ground at the time of this—

"A. I never did measure it. It isn't very high.

"Q. Not very high.

"A. I imagine—

"Q. Would you say the ground was muddy?

"A. No, sir, the ground wasn't muddy.

"Q. Was it soft?

"A. Might say a little spongy, but it wasn't soft.

"Q. You allege in there [the petition] the field was muddy. Was it or was it not?

A. I wouldn't say it was muddy. He went over it with a big bailer and never got stuck only in one place."

Following the accident Mr. Blackmore was hospitalized for the injuries which he received in the fall. He was placed in traction for a broken neck.

The trial court in announcing its ruling upon the demurrer to the plaintiff's evidence, which it sustained, stated in substance that the evidence did not establish contributory negligence on the part of Mr. Blackmore as a matter of law; that the evidence of the plaintiff, as viewed on demurrer, does not show any negligence on the part of the defendant, Victor Auer; and that Mr. Blackmore assumed the risks of his employment. The trial court concluded that the injuries of Mr. Blackmore, deceased, were the result of "an accident where no one was to blame."

The foregoing announcements of the trial court disposed of the grounds upon which the demurrer to the plaintiff's evidence was predicated.

In reviewing a demurrer to the evidence this court is called upon to review only the sufficiency of the evidence and not to weigh it for the purpose of rendering a decision on the merits of the action and this same duty is incumbent on the trial court. In testing the sufficiency of the evidence as viewed on demurrer the court shall consider all of the evidence as true, shall consider that favorable, together with all reasonable inferences to be drawn therefrom, and disregard that unfavorable, and shall not weigh any part that is contradictory, nor weigh any difference between direct and cross examination, and give the evidence a liberal construction resolving all doubt against the party making the demurrer and, if so considered, there is any evidence which supports or tends to support the case on any theory, the demurrer must be overruled. (*Kendrick v. Atchison, T. & S. F. Rld. Co.,* 182 Kan. 249, 320 P. 2d 1061, and authorities cited therein; and *Carlburg v. Wesley Hospital & Nurse Training School,* 182 Kan. 634, 323 P. 2d 638.)

The evidence is uncontroverted that Mr. Blackmore, deceased, suffered injury resulting in damages. The question is whether such damages were caused by the negligence of the defendant, Victor Auer (there being no question raised concerning the liability of his wife, if liability is established as to him), and whether Mr. Blackmore at the time he received the injuries was free from negligence and was free from the doctrine of assumption of risk.

The appellant takes the position that the evidence was "sufficient to go to the jury on the questions of whether or not the defendant was negligent, whether that negligence caused damage to the plaintiff and whether the plaintiff was free from contributory negligence, or whether the plaintiff had assumed the risk."

Negligence is never presumed. It must be established by proof, but it may be shown by circumstantial evidence where the circumstances are proved and their relation to each other is such that intelligent, fair-minded triers of the fact may with reason find that the negligence with which the defendants are charged has been established. To meet the burden of proof on the issue of negligence the evidence must be substantial and satisfy the obligation imposed upon a plaintiff in a civil action to prove such negligence by a preponderance of the evidence. (*Brown v. Clark*, 152 Kan. 274, 103 P. 2d 907.)

The foregoing rules of law are conceded by the parties, and it is unnecessary to dwell at length upon fundamental doctrine in the law of negligence or to reiterate in great detail the definition of negligence. On this subject the reader is referred to *Haggard v. Lowden*, 156 Kan. 522, 134 P. 2d 676; *Garrison v. Hamil*, 176 Kan. 548, 271 P. 2d 307; *Hickert v. Wright*, 182 Kan. 100, 319 P. 2d 152; *Steele v. Rapp*, 183 Kan. 371, 327 P. 2d 1053, both court and dissenting opinions; 38 Am. Jur., Negligence, § 2, p. 642; and 65 C. J. S., Negligence, § 1, p. 303.

It may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury.

It is suggested by the appellant that the evidence adduced in support of the allegations contained in the petition must be construed to show that Mr. Blackmore "was ordered to stand upon the hayrack which was pulled over uneven and rough terrain at a speed of four (4) miles per hour; that this speed in connection with the roughness of the ground caused the plaintiff's [Mr. Blackmore's] hay hook to pull out of a bale of hay, which in turn caused him to be catapulted from the wagon, thus resulting in his broken neck."

Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. The plaintiff who sues his fellow man sues for a breach of duty owing to himself.

What, if any, is the wrongful character of the acts of the defendant, Victor Auer? Can it be said as a matter of law that

Victor Auer was free of negligence? Stated in other words, could reasonable minds differ as to whether Victor Auer was negligent?

An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation;* it is risk to another or to others within the range of apprehension. (*Palsgraf v. Long Island R. R. Co.,* 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253; and Seavey, Negligence, Subjective or Objective, 41 Harv. L. Rev. 6.) The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based.

From the evidence it is uncontradicted that the defendants were using equipment which they had used many times before in the same manner in which it had previously been used. Mr. Blackmore was an experienced farm hand having worked for the defendants for approximately thirteen or fourteen years continuously on the same farm, during which time he performed the usual, normal and customary work of a farm hand. On many occasions he performed the identical work in which he was engaged at the time he received his injuries. It is clear from the evidence that Mr. Blackmore was familiar with the field where the work was being done. He described the field in detail and had been over the field himself raking the oats into windrows and assisted in the baling of the oats on the day of the accident.

While the petition alleged that the field was muddy, the testimony of Mr. Blackmore on cross examination was that the ground was "a little spongy." This is not inconsistent with his testimony on direct examination that the field was rough or bumpy. It merely indicates the condition of the soil in the field which Mr. Blackmore described as rough or bumpy, and thereby limits the reasonable inferences to be drawn from his testimony relative to the field being rough or bumpy. It also throws light upon the question whether four miles per hour was too fast to travel under the existing circumstances.

The vigor of the rule heretofore stated in testing the sufficiency of the evidence on demurrer yields to the impact of admissions made by a party in his testimony while a witness in the case, and such admissions, frequently spoken of as informal admissions, are binding and conclusive upon him if uncontradicted or unexplained, whether

such admissions are elicited on direct examination or on cross examination of the party. Direct application of the foregoing rule was made in *Bell v. Johnson,* 142 Kan. 360, 46 P. 2d 886. Syllabus ¶ 2 reads:

"Where the plaintiff," who is the only witness in his behalf, testifies to a state of facts which precludes his recovery, the effect cannot be avoided, and he is bound thereby."

The foregoing is also the substance of the holdings in *Morton v. Brinks,* 108 Kan. 743, 197 Pac. 210; *Morton v. Brinks,* 114 Kan. 319, 219 Pac. 527; and *Anderson v. Thomas,* 184 Kan. 240, 336 P. 2d 821. Though stated in various ways, the rule is applied where the plaintiff's own testimony convicts him of contributory negligence. (*Ray v. Allen,* 159 Kan. 167, 152 P. 2d 851; *George v. Ayesh,* 179 Kan. 324, 295 P. 2d 660; and see, *Bankers Mortgage Co. v. Robson,* 123 Kan. 746, 256 Pac. 997; *Atherton v. Goodwin,* 163 Kan. 22, 180 P. 2d 296; and *Nolan v. Hebrew,* 177 Kan. 363, 278 P. 2d 1011. See, also, 31 C. J. S., Evidence, § 381, p. 1173.)

It must be observed that *all the evidence* presented in the record to this court for review is comprised of the testimony of Mr. Blackmore, deceased, the original plaintiff in this action. The appellant stands in his stead on the second trial of the action in the district court, where she presented the transcript of Mr. Blackmore's testimony as the plaintiff's evidence.

It has been said before a court is justified in deciding that the *ordinary manner of doing an act* is negligent, it should be clearly convinced of such negligence. What men ordinarily do is ordinarily prudent and careful. (*Mo. Pac. Rly. Co. v. Holley,* 30 Kan. 474, 1 Pac. 554.) While a custom is not conclusive as a standard of reasonable prudence, there is a reasonable basis for the contention that what is ordinarily done by men generally in a given activity has some relevancy to the inquiry as to what an ordinarily prudent person would do under the same circumstances. (*Morrison v. Kansas City Coca-Cola Bottling Co.,* 175 Kan. 212, 263 P. 2d 217; and see, 38 Am. Jur., Negligence, § 34, pp. 679, 680.)

There is no magic in the word "speed" itself. Resort must be made to the evidence to see whether this rate of travel, described as approximately four miles per hour, in a field with a flat bed wagon onto which baled hay was being loaded was unreasonable under all of the conditions and circumstances disclosed by the evidence. Here the defendants' son by Mr. Blackmore's own state-

ments had no difficulty keeping up with the tractor while he was walking in the field. Not only this but while the tractor was pulling the flat bed wagon across the field at approximately four miles per hour, the son also had time to pick up all the bales along the course of travel and load them onto the flat bed wagon.

The mere fact that the word "speed" is used in conjunction with travel over rough and uneven terrain does not necessarily give rise to a jury question of negligence on the part of the defendants. It is a matter of common knowledge that agricultural fields which have been tilled and planted to crops are rough and bumpy when travel is undertaken upon them.

We hold as a matter of law upon all the facts, conditions and circumstances presented by the evidence in this case, viewing such evidence on demurrer, that the defendant, Victor Auer, was free of any wrongful, or negligent, act in driving his tractor over rough and uneven terrain in a field that was "a little spongy" at a speed of approximately four miles per hour while Mr. Blackmore was loading baled hay on a flat bed wagon hitched thereto, that being one of the ordinary methods and the usual and customary manner of loading baled hay in a field where the bales are scattered. Victor Auer was free from negligence in ordering Mr. Blackmore to load the bales on the flat bed wagon, or in ordering him to stand on the flat bed wagon and load the same while it was in motion. These are the ordinary and usual duties of a farm hand where the farming operations include the handling of livestock such as the evidence discloses in this case. This particular type of common farm work is not inherently dangerous.

We do not think the fact that Mr. Blackmore "hollered at Mr. Auer to slow it down a little" altered the character of the defendant's acts to make them wrongful. If it could be said that Victor Auer made an error in judgment, this does not make him accountable in damages. The rule on this point is well stated in 35 Am. Jur., Master and Servant, § 121, pp. 549, 550, as follows:

"An employer is not, unless made so by statute, an insurer of the safety of his employees. The common law does not deem it politic or expedient that persons who enter the employment of others should be insured against injury incurred in the discharge of their duties. An employer is liable to an employee for injuries received in the course of employment, as it ordinarily is expressed, not because of danger which inheres in the employment, but only by reason of negligence on the part of the employer. It is elemental in every case involving the liability of an employer for an injury to his employee that in the

absence of some special contract or statute expressly providing therefor, there can be no recovery unless the master has been negligent,—has been guilty of some breach of duty owing by him to the servant. An employer is liable for consequences not of danger, but of negligence, and hence, is not to be held accountable in damages for the consequence of what commonly is termed 'error of judgment,' or for anything he could not avoid by the exercise of care and foresight. . . ."

We may summarily pass the question of contributory negligence by noting that Mr. Blackmore's testimony did not establish contributory negligence as a matter of law.

We shall next consider the doctrine of assumption of risk and its application to the facts herein.

Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee or servant agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee or servant. (56 C. J. S., Master and Servant, § 357, pp. 1148, 1149.)

In *Railway Co. v. Bancord,* 66 Kan. 81, 71 Pac. 253, it was said:

". . . But, reduced to its last analysis, the doctrine of assumed risk must rest for its support upon the express or implied agreement of the employee that, knowing the danger to which he is exposed, he agrees to assume all responsibility for resulting injury. To raise an implied agreement the risk assumed must be known to the employee, or it must be of such nature as, by the exercise of reasonable observation and caution for his own safety, he should have known it. It can never be said that one has agreed to assume responsibility for that of which he had no knowledge, or of the existence of which he is not chargeable with notice." (p. 88.)

The foregoing language was quoted with approval and applied in *Parker v. City of Wichita,* 150 Kan. 249, 92 P. 2d 86. It was also quoted in *Taylor v. Hostetler,* 186 Kan. 788, 352 P. 2d 1042.

It has been said that one who, knowing all the danger and peril of pursuing a given course and being under no compulsion to encounter the same, freely and voluntarily continues therein, cannot recover damages for injuries he may suffer. (*Sweet v. Railroad Co.,* 65 Kan. 812, 70 Pac. 883; and *Cooper v. Southwestern Bell Telephone Co.,* 159 Kan. 67, 151 P. 2d 692.)

The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious,

such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. (*Lively v. Railway Co.*, 115 Kan. 784, 225 Pac. 103, and authorities cited therein.

The reason for the doctrine of assumption of risk has been stated in *Lively v. Railway Co.*, supra, in the following language:

". . . It is also a part of the doctrine of assumption of risk that a workman's recourse, when called upon to perform a task too heavy or too dangerous for his capacity, is to quit his employment. That sounds harsh, too, but unless the court is to usurp the functions of the legislature it has no alternative but to declare the law as it is. In *Iron-Works Co. v. Green*, 79 Kan. 588, 594, 100 Pac. 482, it was said:

" 'At the first glance this seems to be a harsh rule, but since men have the right to accept employment in which both parties know the employee will be exposed to danger, and the employee has a right to accept greater compensation by reason thereof, neither the courts nor legal writers have been able to evolve a more equitable rule.' (See, also, *S. K. Rly. Co. v. Moore*, 49 Kan. 616, 31 Pac. 138.)

"So this plaintiff, knowing as he did how heavy the rail was, and how many men were needed to handle it, and also knowing better than his employer— better than anybody else—how strong he was, how hard he could tax his muscles with safety to himself, continued in the employment and assumed the risk (*Stenvog v. Minnesota Transfer Ry. Co.*, 108 Minn. 199, 25 L. R. A., n. s., 362, and note) of hurting himself with the usual consequences, strain, rupture, hernia, which flow from overtaxing one's strength. . . ." (p. 789.)

For other Kansas cases on the doctrine of assumption of risk, see *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 Kan. 129, 12 Pac. 582; *S. K. Rly. Co. v. Drake*, 53 Kan. 1, 35 Pac. 825; *Morbach v. Mining Co.*, 53 Kan. 731, 37 Pac. 122; *Walker v. Scott*, 67 Kan. 814, 64 Pac. 615; *Ernst v. Railroad Co.*, 105 Kan. 706, 185 Pac. 1053; and *Luebken v. City of Hanover*, 129 Kan. 443, 283 Pac. 501. See, also, 35 Am. Jur., Master and Servant, § 293, pp. 715, 716.

The doctrine of assumed risk must not be confused with contributory negligence. The distinction was set forth in *Kleppe v. Prawl*, 181 Kan. 590, 313 P. 2d 227, 63 A. L. R. 2d 175, by paraphrasing from 65 C. J. S., Negligence, § 117, p. 709; and 38 Am. Jur., Negligence, § 172, p. 847. The language used in *Kleppe v. Prawl*, supra, indicating the distinction was quoted in *Taylor v. Hostetler*, supra, at page 800. (See, also, *Lively v. Railway Co.*, supra.)

The appellant relies on *Rush v. Brown*, 153 Kan. 59, 109 P. 2d 84, for the proposition that where a master orders a servant into a situation of danger, and in obeying the command the servant is injured, he will not be charged with contributory negligence, or with an

assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under such orders, provided he acts with reasonable prudence in executing such orders.

In that case a farm laborer was ordered to climb from a tractor over and onto the hitch assembly of a disk tiller, commonly known as a "one-way," while the machinery was in motion so that he could work the trip lever in case the defendant, his employer, who was driving the tractor got stuck. The tiller was new to the plaintiff and he had never used it until the day preceding the accident. The employer had never warned the employee concerning the danger of using the tiller. There was a trip lever which contained a loop to which a rope could be fastened so that the lift mechanism of the tiller could be operated from the tractor seat, but the employer failed to fasten a rope to the lever to make the machine safe as contemplated by the manufacturer, to avoid the necessity of someone climbing over the tiller to disengage the machine while the tractor was in operation. The plaintiff crawled onto the hitch from the platform of the tractor over the framework of the tiller on his hands and knees to a place where he could reach the trip lever, while the tractor and tiller were moving over rough ground at a speed of four miles per hour. When the plaintiff reached the trip lever and exerted pressure thereon, his right foot slipped down into the framework and in front of the disks. He "holloed" to the defendant as loudly as he could, but trash caught his foot and took it under the disk before the tractor was stopped. The plaintiff testified that it took approximately thirty seconds before the defendant could stop the tractor, and when he looked up the defendant was fumbling with everything, but could not hit the right thing to stop the tractor, which was finally stopped by pulling back the throttle instead of using the clutch.

We think the situation in *Rush v. Brown*, supra, is quite different than the situation in the instant case. Part of the hitch assembly of a one-way disk tiller is a shifting mechanism, so designed to compensate for turning and uneven terrain as the machine is used in the field, and it was obviously a situation of danger into which the master there ordered the servant. In the instant case Mr. Blackmore was ordered to ride on the flat bed wagon and load bales while the wagon was proceeding at a speed of approximately four miles per hour. The flat bed wagon was the usual and customary place for one to ride when loading bales, and Mr. Blackmore was not ordered into a position of danger. It was simply the place in

which he performed his work—the stacking of bales onto the wagon where he stood.

We think the evidence presented by the plaintiff in this case, as viewed on demurrer, clearly brings the case within the doctrine of assumed risk. It is common knowledge particularly to farmers and experienced farm laborers that a hay hook, when placed into a bale of hay for the purpose of moving it, will frequently pull out for one reason or another. In this particular case Mr. Blackmore's hook came out of the bale when the flat bed wagon went over a bump, but this was one of the risks which he assumed in his employment.

The appellant contends that a servant does not assume risks arising from the master's negligence unknown to the servant, citing *Fishburn v. International Harvester Co.*, 157 Kan. 43, 138 P. 2d 471; *McMullen v. Railway Co.*, 107 Kan. 274, 191 Pac. 306; *Hollingsworth v. Berry*, 111 Kan. 730, 207 Pac. 841; *Toops v. Atchison, T. & S. F. Rly. Co.*, 128 Kan. 189, 277 Pac. 57 [reserved in *A. T. & S. F. Ry. Co. v. Toops*, 281 U. S. 351, 74 L. Ed. 896, 50 S. Ct. 281]; *Schwarzschild v. Drysdale*, 69 Kan. 119, 76 Pac. 441; and *Barnett v. Cement Co.*, 91 Kan. 719, 139 Pac. 484. Having already determined that the defendant, Victor Auer, was free from negligence, these decisions have no application to the instant case.

If it could be successfully argued that there was negligence on the part of the defendant, Victor Auer, in the loading of bales by the method used, the reasoning of Mr. Justice Valentine speaking for the court in *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, supra, is particularly applicable to show there was no culpable negligence, and the employee who is hired and paid for assuming a known danger assumes the risk of his employment.

In *Sullivan, Administrator v. Davidson*, 183 Kan. 713, 332 P. 2d 507, cited to the trial court, the deceased farm laborer was held guilty of contributory negligence as a matter of law, and the court specifically passed the question whether the employee assumed the risk of his employment.

For the reasons heretofore stated the judgment of the lower court is affirmed.

Robb and Fatzer, JJ., concur in the result.

Wertz, J., dissents from Syllabi ¶¶ 3 and 5 and the corresponding portions of the opinion.