No. 43,821

PETER J. CONBOY, JR., *Appellant,* v. RAY CROFOOT, JOHN CROFOOT, and CLAIRE ROBINSON, d/b/a CROFOOT-ROBINSON GRAIN AND FEED COMPANY, *Appellees.*

(397 P. 2d 326)

Opinion filed December 12, 1964.

*Bill G. Honeyman,* of Topeka, argued the cause, and *J. A. Dickinson, Sam A. Crow* and *Ralph F. Skoog,* of Topeka, were with him on the briefs for appellant.

*Samuel Mellinger,* of Emporia, argued the cause, and *John G. Atherton,* of Emporia, was with him on the briefs for appellees.

The opinion of the court was delivered by

FATZER, J.: This appeal is from an order of the district court sustaining the defendants' demurrer to the plaintiff's amended petition.

The facts alleged in the amended petition are that the plaintiff, Peter J. Conboy, Jr., was employed by the defendants on December 5, 1960, as a general laborer to aid and assist the defendants in the maintenance of certain cattle feeding lots owned and operated by them. The plaintiff's duties in general were to load feed bunks for the cattle from a truck he drove which had an automatic feeder box attached on the truck bed. In performing this operation, the only time it was necessary for the plaintiff to be on the ground was when

he raised or lowered the spout of the feeder box at each bunk and occasionally to walk into the feeding lots.

On December 20, 1960, the defendants were preparing a shipment of cattle to be removed from the feeding lots and during this operation the plaintiff was ordered by the defendants to stand in the center of a sorting alley, directing the cattle as they came toward him individually into one pen if they were ready for the market and into another pen if they were not yet ready for the market, under the supervision of John Crofoot. The portion of the feeding lot in which the plaintiff was ordered to stand was extremely wet and muddy due to the snow, sleet and rain which had fallen prior to and on December 19, 1960, but was partially due to the fact that a large number of cattle were being kept within the area of the feeding lots; however, it is characteristic of feeding lots to be a great deal more muddy than surrounding ground.

On the day in question, the plaintiff was wearing ordinary work boots which were sufficient to protect his feet from the elements during the performance of his regular duties. The temperature on the morning of December 20, 1960, was from 21 to 22 degrees, and to carry out the orders and commands of his employer, the plaintiff was forced to stand in mud continuously for a period lasting from two to two and a half hours. The amended petition alleged it was or should have been obvious to the defendants, all of whom were present and on horseback, that the plaintiff was being forced to stand in mud to carry out their orders, but they made no effort to provide him with rubber boots or overshoes of any kind, nor did they provide him an opportunity to leave his position to warm himself. As a result of plaintiff's exposure, he suffered a severe frostbite to his right foot which necessitated the amputation of the first two toes on his right foot.

At the outset, we deem it proper to note the amended petition did not allege (1) that the defendants in any manner coerced, threatened or persuaded the plaintiff to perform his duties at the time and place in question; (2) that the weather on the morning of the injury was extreme or other than normal for that time of year; (3) that the defendants agreed to provide the plaintiff with clothing or footgear as part of his employment, or that they were requested to provide him with rubber boots or suitable overshoes, or that he was prevented from leaving his duties to secure the same; (4) that the plaintiff protested or informed the defendants that his feet were wet and cold, or that he requested an opportunity

to leave his work and go to a place where he might warm his feet; (5) that the defendants were aware that plaintiff's footgear was inadequate or that his feet were cold, and (6) that plaintiff was induced to continue with his duties by any promise of betterment or indemnity if he would continue his work.

The plaintiff predicates his claim upon a common-law duty alleged to be owed by the defendants to him. It is clear, however, that no cause of action for negligence is stated unless it is alleged that there is a duty on the part of one to protect another against injury, a breach of that duty, and that the injury received is the proximate result of that breach. (*Rowell v. City of Wichita*, 162 Kan. 294, 176 P. 2d 590.) What, then, was the wrongful character of the acts of the defendants? In *Blackmore v. Auer*, 187 Kan. 434, 357 P. 2d 765, it was said:

"An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and *risk imports relation;* it is risk to another or to others within the range of apprehension. (*Palsgraf v. Long Island R. R. Co.*, 248 N. Y. 339, 162 N. E. 99, 59 A. L. R. 1253; and Seavey, Negligence, Subjective or Objective, 41 Harv. L. Rev. 6.) The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based." (l. c. 441.)

Generally speaking, the furnishing of a safe place to work and safe tools and appliances with which to do the work is among the absolute duties of the master; and unless the servant's attention is drawn to defects or the dangerous condition of the place or the appliances furnished, or he should have known of them, he is not required to make an investigation, but may rest upon the assumption that the master has performed his duties in that respect. (*Emporia v. Kowalski*, 66 Kan. 64, 71 Pac. 232; *Buoy v. Milling Co.*, 68 Kan. 436, 75 Pac. 466; *Fishburn v. International Harvester Co.*, 157 Kan. 43, 138 P. 2d 471; *Concannon, Administrator v. Taylor*, 190 Kan. 687, 690, 378 P. 2d 82.)

The place where the plaintiff alleged he was required to perform his duties and about which he complains, was wet and muddy cattle feeding lots. It was those lots which he claims were not a reasonably safe place in which to work. He alleged that he was empoyed "as a general laborer to aid and assist them (the defendants) in the maintenance of cattle feeding lots." Cattle feeding lots are maintained to feed and fatten cattle for the market, and

a part of the process to ready them for the market is to move them into proper pens for shipping. Under the circumstances alleged, it was the plaintiff's duty as a general laborer to not only feed the cattle but to aid and assist the defendants in whatever was reasonably necessary in getting them from the lots into proper pens for shipping. Moreover, the plaintiff acknowledged that the condition of the defendants' lots was no different than other cattle feeding lots by his allegation "that it is characteristic of feeding lots to be a great deal more muddy than the surrounding ground." Hence, when the plaintiff was ordered to stand in the sorting alley to direct the cattle into different pens, he was performing general duties for which he was hired, and they could only be performed in the defendants' wet and muddy feeding lots. No claim is made that the lots were maintained in a negligent manner, nor is it alleged that the defendants failed to provide the plaintiff with safe tools and equipment. However, the contention that the obligation to provide safe tools and equipment includes the duty to provide the plaintiff with proper clothing and suitable footwear is untenable in the absence of an agreement to do so. The rule is stated in 35 Am. Jur., Master and Servant, § 105, p. 533, that whatever duty devolves upon the master in the latter respect rests only upon a special contract, and no such contract was alleged. See, *King v. Interstate Consolidated R. R. Co.*, 23 R. I. 583; 51 A. U. 301.

We think it must be said that the defendants did not violate any duty owing to the plaintiff by reason of directing him to perform duties in their feeding lots under the circumstances alleged, and we conclude the plaintiff's amended petition failed to show that the place provided for him to work was unsafe, except as to the weather. (Prosser on Torts, 3rd Ed., § 31, p. 149.) But the defendants had no control over the temperature and it was patently impossible for the plaintiff to perform any of his duties without being exposed to temperatures of 21 to 22 degrees and without placing himself on the ground within the wet, muddy feeding lots.

One of the risks incident to long, continued outdoor employment in the wintertime is that one's hands and feet will become cold and may be injured by freezing, is so clearly within the rule of assumption of risk on the part of the servant as to require no argument. When a person is capable of and intelligent enough to understand the physical effects of heat and cold upon his body, he assumes the risk for a continuance in service, and cannot recover for the suffering

and inconvenience directly due or caused by the exposure to the heat and cold. (*Gulf & S. I. R. Co. v. Bryant,* 147 Miss. 421, 111 So. 451, 52 A. L. R. 901.)

In *Cold Sunday Case,* 78 Miss. 140, 28 So. 807, a deck hand on the appellant's boat was ordered to roll cotton bails on board, which were covered with ice and snow. Three fingers of the appellee's hand were frostbitten and had to be amputated. The Supreme Court of Mississippi denied recovery, and said:

". . . The laborer must be presumed to have knowledge equal, if not superior, to his employer of the effect of cold upon his feelings and person. His own temperament is better known to him than any one else, and his own sensations sound the alarm to himself. Men are presumed to have ordinary common sense, until the contrary is shown, and the law does not speculate on degrees of knowledge about weather." (l. c. 147.)

See, also, *Chesnut v. Chicago, B. & Q. R. Co.,* 284 Ill. App. 317, 1 N. E. 2d 811; *L. & N. R. Co. v. Williams,* 165 Ky. 386, 176 S. W. 1186, L. R. A. 1915 E 613; *Stockwell v. C. & N. W. Ry. Co.,* 106 Iowa 63, 75 N. W. 665, and *King v. Interstate Consolidated R. R. Co.,* supra.)

In the Chesnut case, *supra,* the plaintiff alleged that the defendant breached its common-law duty by requiring him to work in such extreme heat and for such a period of time that he suffered a heat stroke. It was held the allegation that the defendant directed the plaintiff to work in the sun and to continue after the usual quitting hour, did not contain any element of negligence, and it was said:

". . . 'In occupations involving no extraordinary hazard, in which an employee engages voluntarily, without compulsion or emergency he is conclusively presumed to have assumed such risks as are ordinarily incidental thereto, not due to the employer's negligence or violation of law. *Chicago, Rock Island and Pacific Railway Co. v. Ward,* 252 U. S. 18; *Chicago and Northwestern Railway Co. v. Bauer,* 241 id. 470.' *Huff. v. Illinois Cent. R. Co., supra.* There is no allegation in any of the counts that charges the defendant with having furnished plaintiff defective tools or appliances with which to work. Neither is there an allegation in any of the counts that the place where plaintiff was to perform the work was not suitable and reasonably safe except as to such hazard as might arise from the extreme heat of the weather." (l. c. 320, 321.)

When the plaintiff accepted employment from the defendants, he knew that he would be required to perform his duties outdoors in cattle feeding lots which would be wet, muddy and cold. Assuming, as we must, that the plaintiff was a person of ordinary intelligence, he knew his own physical condition and his ability

to endure the cold. There was a period of time in which the plaintiff was not in danger, presumably the longer he stood in the alley the colder his feet became. While he might not have been able to definitely determine the amount of cold his feet could stand under the prevailing conditions, yet as to that risk he knew better than anyone else how long he ought, for his own safety, to continue to work. That fact was known to the plaintiff alone and he alone could have prevented his injury by informing the defendants of the condition of his feet and requesting that he go warm them or obtain suitable footwear. Whether the plaintiff's undertaking at that time was usual or unusual, the risk could not have been more obvious.

The plaintiff's amended petition did not present a question for determination by the jury. Under the circumstances which attend, the question was one for determination by the district court. In *Blackmore v. Auer,* supra, it was said:

"The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it." (l. c. 444, 445.)

See, also, *Lively v. Railway Co.,* 115 Kan. 784, 225 Pac. 103, and authorities cited therein; *Cooper v. Southwestern Bell Telephone Co.,* 159 Kan. 67, 151 P. 2d 692, and *Uhlrig v. Shortt,* 194 Kan. 68, 397 P. 2d 321, this day decided.

As here presented, the case is simply one where the defendants ordered the plaintiff to do certain work, leaving him free to adjust his efforts to the prevailing weather and his own physical capacities. The plaintiff was the only one who knew his feet were cold and was the only person who was aware that danger existed. Until that danger became known to the defendants, under the circumstances alleged, there was neither a duty nor an opportunity for them to protect the plaintiff in any manner.

In view of the foregoing, we conclude the district court did not err in sustaining the defendants' demurrer to the plaintiff's amended petition and that judgment is affirmed.

It is so ordered.